EGAN, Respondent, v. DOTSON et al., Appellants.

(155 N. W. 783.)

(File No. 3624. Opinion filed December 31, 1915. Rehearing denied February 9, 1916.)

1. **Libel and Slander—"Privileged Communication"—Candidate for Office—Plea of Privilege—"Libel"—Constitution—Statute—Malice, Question for Jury—Necessity of Investigating Truth of Charge.**

   Under Const. Art. 6, Sec. 5, providing that every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right; that on trials for libel the truth, when published with good motives and for justifiable ends, shall be a sufficient defense, and that the jury shall have the right to determine the fact and the law under the direction of the Court; and Civ. Code, Sec. 29, defining "libel" as a false and unprivileged publication exposing any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation; and Civ. Code, Sec. 31, Subd. 3, defining "privileged communication" as one without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation as to afford a reasonable ground

for supposing the motive of the communication innocent; **held,** that a published charge made against a candidate for public office, is privileged, if the person making it believes in the truth of the charge and has probable grounds for his belief; in other words, if the publication is not malicious, it is privileged, whether true or false; that under the Constitution and the statutes, the question of malice is for the jury, and they may find that the defendant acted maliciously, if satisfied that he did not make such an investigation as to the truth of the charge as the nature of the charge and the surrounding circumstances demanded.

2.   Same—Instructions—Libelous Publication—Candidate for Office—Privilege—Truth of Charge as Defense—Belief in Good Faith—Newspaper Discussion, Propriety of, Latitude of—Express Malice, Necessity of Proof—Inference of Malice, When Refuted—Matters in Defense, Whether in Mitigation, or in Defense to Refute Malice—Proper, and Improper, Instructions.

Instructions in a libel suit for defamation of character of a candidate for office, to the effect that the charge, if true, is not libelous, that recovery cannot be had if the publication was false, provided defendant acted honestly and in good faith without express malice, and believed, under circumstances warranting belief, the publication to be true, that defendants, being electors, and publishers and editors of a newspaper, were entitled to consider and discuss in said newspaper the character, reputation and qualifications of plaintiff for office, which are subject to the frankest scrutiny and investigation, and that much latitude must be allowed in the publication for the information of voters in regard thereto, that proof of express malice is necessary to show such publication actionable, that in case of such publication the occasion rebuts the inference of malice which the law would otherwise raise from the falsity of the article, that malice cannot be inferred from mere publication of the article, but that the articles in question were not privileged, regardless of their contents, though relating to plaintiff's qualifications for the office of Governor, if maliciously published—clearly and accurately state the law under the statutes and the decisions of the Supreme Court. But, held, further, that instructions to the effect that matters set up by way of defense, involving the truth of the charges, the question of malice, publication by the editor without the knowledge or procurement of the publisher of the newspaper, facts tending to show the publication privileged, and tending to show justification, good faith and honest belief on the part of the editor in the truthfulness of the charges, and that he had reasonable

cause to believe them true, do not constitute a defense, but were in the nature of mitigation of damages, were improper; since those matters are admissible not only in mitigation of the damages, but as tending to rebut malice; and such improper instructions contradicted the rules of law laid down in the instructions properly given.

3. **Libel and Slander—Disproof of Malice—Evidence, Exclusion of—Reputation of Plaintiff—Prior Publication of Articles Concerning, Editor's Knowledge of—Former Court Records, Proof of—Showing Necessary to Admission of Evidence.**

In such suit, where defendants sought to justify the publications in question as being privileged, held, that evidence of prior newspaper and pamphlet publications of matter similar to the articles complained of; proof of reputation of plaintiff at the time of the publications; proof of former court records, and similar proofs, were admissible, not only in mitigation of damages, but to disprove malice, upon a showing that defendant editor had knowledge of them at the time he caused the articles to be published, and that he made such reasonable investigation of their truth as the circumstances required.

4. **Trials—Libel and Slander—Instructions—Assuming Falsity of Publication—"Intention to Injure," Effect.**

An instruction, in a suit for defamation of character of a candidate for office, which assumes that some of the published statements in question were false, was erroneous; and also wherein it charged that actual malice may consist either in a "direct intention to injure plaintiff, or in a reckless disregard of his rights and the consequences that may result to him;" the words "direct intention to injure" should have been qualified or further explained, since it is only the injury contemplated by Civ. Code, Sec. 29, and which exposes to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation, for which plaintiff can recover damages. Nor does a "direct intention to injure" plaintiff constitute malice; but the act must be wrongfully and intentionally done with an evil mind and a wish to injure.

5. **Libel and Slander—Candidate for Office—Express Malice—False Statement, in Good Faith, Effect.**

If statements made in a newspaper publication concerning plaintiff, a candidate for office, were false, but made in good faith, for the purpose of defeating plaintiff for nomination for Governor, they do not amount to evidence of express malice, although the effect of losing the nomination may have been injurious to plaintiff; since defendants had a right to use their utmost endeavor to defeat plaintiff's nomination if they con-

sidered him unfit for the office, provided they acted without malice.

6. **Libel and Slander—Instructions—Dislike and Ill-will Distinguished from Malice—Honest Belief in Truth of Charge, Effect.**

While proof of dislike and ill-will is competent evidence on the question of malice, still the trial court should have instructed that dislike and ill-will may exist, and yet actual malice be wanting, as proposed by defendants' requested instructions; since if defendants honestly believed in the truthfulness of the charges published, they might, as good citizens, entertain a feeling of dislike and ill-will toward plaintiff.

7. **Libel and Slander—Instructions—Privileged Discussion of Character of Candidate—Failure to Refer to Knowledge of Falsity—Misleading Instruction.**

The trial court, in a suit for damages for publication of an alleged libel concerning plaintiff, a candidate for office, erroneously charged that proof of actual malice is shown if defendants made use of the privilege accorded to all newspapers to discuss the moral character of candidates for office, as a cover or a means or the occasion of publishing false statements; in that the element of knowledge of the falsity, or of reckless disregard for the truth or falsity of the publication, and of intentionally so doing, were wanting in the instruction.

8. **Appeals—Error—Instructions Excepted to, but not Argued—Review.**

Where an exception to an instruction of the trial court was taken, but was not argued on appeal, the matter will not be considered.

9. **Libel and Slander—Defense of Truthfulness of Publication—Burden of Proof.**

In a suit for defamation of character, held, that an instruction of the trial court that, upon an affirmative allegation of defendants' answer as to whether the matter complained of was true or false, the burden of proof was on the defendant, correctly stated the law.

10. **Libel and Slander—Malice, Necessity of Showing as to Both Defendants—Malice, Connection of With Publication, Necessity.**

In a suit for damages for libelous publication concerning plaintiff's character, held, that the defendants' contention, in connection with the evidence offered and by instructions requested, to the effect that, even though malice be established as to one of the defendants, yet it must still be shown that the malice was connected with the publication, and that proof of malice on the part of one defendant is insufficient to sustain a verdict against the other, was correct. So held, where one

of the defendants was the publisher, and the other the editor of the newspaper in question.

11. **Libel and Slander—Truth of Charges, Uncontradicted Proof of—Disregard, by Jury, of Matters so Proven—Duty of Trial Court.**

Where, in a suit for defamation of character, the truth of certain charges alleged in the answer to be true was established by uncontradicted evidence, held, the trial court should have instructed the jury to disregard and eliminate the matters proven to be true.

12. **Trial—Conduct of Counsel pro se—Opening Statement as Facts, Impropriety of—Prejudicial Error.**

Under Code Civ. Proc., Sec. 255, providing that, when the jury has been sworn, the plaintiff, after stating the issues and his case, must produce the evidence on his part, and the defendant may then open his defense and offer his evidence, etc., held, that the plaintiff, acting as his own counsel, and when purporting to make his opening statement to the jury, who gave unsworn testimony in detail, not as matter he expected to prove, but as actual facts coming from his own mouth, was extremely prejudicial to defendants, and was improper.

13. **Appeal—Error—Opening Statement of Counsel to Jury, as Evidence—Prejudicial Error.**

In a suit for defamation of character of plaintiff, a candidate for the office of Governor, held, that the opening statement by plaintiff, as his own attorney, that (referring to defendants) we are not glad when fellow men walk "over the prostrate form of or assassinate the character and destroy the hopes and the honorable life of a fellow citizen," and that they accused him of "stealing $10,000 from a crazy woman, and of raping at least two defenseless women," that when he went to certain places in South Dakota men who had seen the articles in question "said to me they could not support me. * * * Our wives and daughters deny us the right to support you," being statements not afterwards proven nor attempted to be proven, and constituting matters inadmissible in proof and much in the way of argument, the purpose of which could only have been to arouse prejudice in the minds of the jurors, were improper, and in effect extremely prejudicial to defendants.

14. **Trials—Misconduct of Counsel—Argument of Counsel pro se to Jury—Matters not in Evidence—Charging Rival Candidate for Governor with Inducing Publication of Articles.**

In a suit for defamation of character of plaintiff, a candidate for the office of Governor, held, that statements of plaintiff in an argument to the jury, to the effect that a rival candidate for Governor came to a certain town and that "the article was

published," that "Egan's friends were driven away from him. Byrne is elected. Mr. Dotson [one of defendants] is made a member of the Board of Charities and Corrections," which statements constituted matters not in evidence and beyond legitimate inference from facts in evidence, the argument being mostly addressed to the jury, but was sometimes addressed to the audience, were improper and constituted misconduct upon the trial; that they were calculated to arouse the passion and prejudice of the jury.

15.   Trials—Argument of Counsel pro se to Jury—Forcibly Stopping Taking of Depositions, Impropriety of Statement.

In a suit for libel, held, that plaintiff, counsel in his own case, who stated to the jury in argument that he by physical force stopped the taking of a named deposition, no such deposition being offered in evidence, and there being no evidence that it had ever been taken, and that he would have stopped the taking of another deposition had he been present, which deposition was offered in evidence, thus made grossly improper statements; that in making such statements plaintiff confessed he had committed, and if present at the opportune time, would again have committed, an act constituting a serious breach of duty as an officer of court, and which act was a criminal offense.

16.   Trials—Libel—Argument of Counsel pro se—Referring to Unfortunates who Applied to Plaintiff as Clients—To Corporations Which Did Not Apply to Him—Propriety of Remarks.

In a suit for libel, remarks of plaintiff, acting as his own counsel, to the jury in argument, to the effect that his clients had been poor unfortunates, that the "Street Railroad Company and such clients do not come to me. I am the lawyer of the poor," "No man was ever turned away from my office because he did not have money," being entirely irrelevant, and outside of the evidence, and greatly appealing to the passions and prejudices of the jury, constituted irregularity and misconduct of the trial.

17.   Trials—Libel—Argument of Counsel pro se—Disbarred Attorney's Reference to Judges who Presided in Disbarment, Propriety of.

Where, in a suit for libel by one who had been disbarred as an attorney, by the Supreme Court, held, that the remark by plaintiff, his own counsel, to the jury, that "I was disbarred by two men," naming them, and being former members of the Supreme Court, "and just as soon as the people got a chance they retired them, and that is the truth," was improper; the opinion in the case of such disbarment, which discloses fully the facts causing the disbarment, having been offered in evi-

dence in the present case; it appearing further that plaintiff's petition for re-instatement as a member of the bar, and the record of evidence at the hearing therein, being also in evidence, contained an admission of the Court's integrity and motives in the disbarment proceeding, and plaintiff's confessed intention, through such petition and evidence, to apologize to the court, and to retract anything he may have said reflecting upon the integrity of the court; that there was no occasion for plaintiff in the present case, casting aspersions upon the integrity of the jurists named by him in his argument.

18. Trials—Libel—Misconduct and Irregularity—Statement of Counsel pro se to Audience in Argument, Propriety of.

The statement by plaintiff, acting as his own counsel, in a suit for libel, in the course of his argument to the jury, in which he turned to the audience in the court room and said "I know what this audience thinks and what every self- respecting man thinks," and then, turning to the jury, said "and I know what you think; that I should have taken a club and struck him down" (evidently referring to one of the defendants), was improper, and constituted misconduct and irregularity on the trial.

19. Trials—Libel—Closing Argument of Counsel—Alleged Suppression of Plaintiff's Deposition—Prejudicial Error.

The statement of plaintiff's counsel to the jury in the closing argument, in a suit for libel, that defendants had appeared and cross-examined two witnesses, Catholic priests, whose depositions were being taken by plaintiff, and had then procured an order suppressing the depositions because of illegal service of notice of serving same, being a statement outside of the record, was reprehensible and prejudicial.

20. Trials—Argument to Jury—Ethics of Legal Profession—Duty of Counsel—Duty of Trial Courts to Interfere.

The profession of law being instituted for the administration of justice, the duty of the bar is to establish the truth and apply the law to it. Counsel should not, in addressing the jury, travel out of his client's case and assume to supply its deficiencies; he is outside of his duty and his rights when he appeals to prejudice irrelevant to the case; it is license, not freedom of speech, to travel out of the record, basing his argument on facts not appearing; and it is the duty of the circuit courts, in jury trials, to interfere, in all proper cases, of their own motion; this being due to truth and justice.

21. New Trials—Libel—Newly Discovered Evidence—Testimony of Criminal Assault by Plaintiff—Plaintiff's Testimony Concerning Witness Being a "Dummy."

In a suit for libel, where plaintiff claimed damages on ac-

count of defendants' published charges that he had made a criminal assault upon a woman, **held,** that newly discovered evidence to the effect that plaintiff had received various replies to letters making inquiries concerning the woman, warrants a new trial; plaintiff having testified that he received no replies to such letters, and that the woman was "what is known among detective circles as a 'dummy'"; it further appearing that information of said transaction with the woman was in possession of defendant editor at the time of the publications in question.

Appeal from Circuit Court, Minnehaha County. Hon. JOSEPH W. JONES, Judge.

Action by George W. Egan, against C. L. Dotson and another, for damages for defamation of character. From a judgment for plaintiff, and from an order denying a new trial, defendants appeal. Reversed and remanded.

*U. S. G. Cherry,* and *Herbert Abbott,* for Appellants.

*Geo. W. Egan,* Respondent, in pro. per.

(1) To point one of the opinion, Appellants cited: Briggs v. Garrett, 111 Pa. St. 414, 56 Am. Rep. 274, 2 Atl. 513; Atkinson v. Detroit Free Press Co., 46 Mich 341, 9 N. W. 501, 521; Wason v. Walter, L. R. 4, Q. B. 73, 87; Miner v. Post, 46 Mich. 358, 13 N. W. 773; Davis v. Hearst, (Cal.) 116 Pac. 530, 540.

Respondent cited: Jarman v. Rea, (Cal.) 70 Pac. 216; Dow v. Long, (Mass.) 76 N. E. 667; Eikoff v. Gilbert, (Mich.) 83 N. W. 110; Yager v. Bruce, (Mo. App.) 93 S. W. 307; Mertens v. Bee Publishing Co., (Neb.) 99 N. W. 847; Forke v. Homann, (Tex. Civ. App.) 39 S. W. 210; Sweeney v. Baker, 13 W. Va. 158, 31 Am. Rep. 757; Tanner v. Embree, (Cal.) 99 Pac. 547; Palmerlee v. Nottage, (Minn.) 138 N. W. 312; Dauphiny v. Buhne, (Cal.) 96 Pac. 880; Smith v. Burrus, 106 Mo. 94, 16 S. W. 881, 13 L. R. A. 59, 27 Am. St. Rep. 329; Com. v. Clap, 4 Mass. 163, 3 Am. Dec. 212; Farley v. McBride, 103 N. W. 1036; Ott v. Murphy, 141 N. W. 463; Mickelson v. Billard, 73 S. E. 328.

(2) To point two of the opinion, Appellants cited: Coleman v. MacLennan, 78 Kan. 711, 98 Pac. 281, 131 A. S. R. 390; Meyers v. Longstaff,. 14 S. D. 98, 84 N. W. 233; Ross v. Ward, 14 S. D. 240, 85 N. W. 182, 86 A. S. R. 746, 85 N. W. 182; Boucher v. Clark, 14 S. D. 72, 84 N. W. 237; Schull v. Hopkins,

26 S. D. 21, 127 N. W. 550, 29 L. R. A. (N. S.) 691; Miner v. Post, (Mich.) 13 N. W. 773, 775; Bays v. Hunt, 60 Ia. 251, 14 N. W. 785.

(3) To point three of the opinion, Appellants cited: Briggs v. Garrett, 111 Pa. St. 414, 56 Am. Rep. 274, 2 Atl. 513; Bays v. Hunt, 60 Iowa, 251, 14 N. W. 785; Larrabee v. Minnesota Tribune Co., 30 N. W. 462; Coogler v. Rhodes, 38 Fla. 240, 56 A. S. R. 170, 174; Hearne v. DeYoung, 119 Cal. 670, 52 Pac. 150, 154, 499; Williams v. Black, 24 S. D. 501, 124 N. W. 728; 25 Cyc. 517; Wrege v. Jones, 13 N. D. 267, 100 N. W. 705, 112 A. S. R. 679; Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342.

(5) To point five of the opinion, Appellants cited: Boucher v. Clark, 14 S. D. 72, 82, 83; Meyers v. Longstaff, 14 S. D. 98, 108; Ross v. Ward, 14 S. D. 240, 245; Schull v. Hopkins, 26 S. D. 21, 26; Kent v. Bongartz, 15 R. I. 72, 2 A. S. R. 870; Edwards v. Chandler, 14 Mich. 471, 90 A. D. 249; Fowler v. Bowen, 30 N. Y. 20, 24; Coogler v. Rhodes, 38 Fla. 240, 56 A. S. R. 170; Coleman v. McLennan, 78 Kan. 711, 98 Pac. 281, 130 A. S. R. 390, 414; Klinck v. Colby, 46 N. Y. 427; Odgers on Libel and Slander (5th Ed.) 345, 354; Harris v. Thompson, 13 C. B. 333; Lewis v. Chapman, 16 N. Y. 369.

(6) To point six of the opinion, Appellant cited: Schull v. Hopkins, 26 S. D. 21, 127 N. W. 550; Meyer v. Longstaff, 14 S. D. 98, 106-107; Howard v. Sexton, 4 N. Y. 157; Lauder v. Jones, 13 N. D. 525, 101 N. W. 907, 916; Frazier v. McCloskey, 60 N. Y. 337; Krug v. Pitas, 162 N. Y. 154; Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342, 20 L. R. A. 440.

(9) To point nine of the opinion, Appellants cited: Schull v. Hopkins, 26 S. D. 21, 127 N. W. 550; Meyers v. Longstaff, 14 S. D. 98; Boucher v. Clark, 14 S. D. 72; Ross v. Ward, 14 S. D. 240; Coogler v. Rhodes, 38 Ala. 240, 56 A. S. R. 170; Bays v. Hunt, 60 Iowa, 251, 14 N. W. 785; Miner v. Post, (Mich.) 13 N. W. 773, 775.

(10) To point ten of the opinion, Appellants cited: Krug v. Pitas, 162 N. Y. 154, 76 A. S. R. 317; Crane v. Bennett, 177 N. Y. 106, 69 N. E. 274; Haines v. Schultz, 50 N. J. L. 481, 14 Atl. 488; Eviston v. Cramer, 57 Wis. 579, 15 N. W. 760; Smith v. Achley, 11 Met. (Mass.) 367, 45 A. D. 216; Neafie v. Hobo-

ken Printing & Publishing Co. (N. J.) 62 Atl. 1129; Scripps v. Reilly, 38 Mich. 10; Railway Co. v. Prentice, 147 U. S. 103, 13 Sup. Ct. 261, 37 L. Ed. 97, 102; Dunn v. Hearst, 139 Cal. 239, 73 Pac. 138; Wesler v. Great Northern Ry. Co., 18 S. D. 420, 70 L. R. A. 731, 112 A. S. R. 794, 100 N. W. 1097; Davis v. Hearst, (Cal.) 116 Pac. 430; Hearne v. DeYoung, (Cal.) 52 Pac. 150; Mauk v. Brundage, 68 O. S. 89, 67 N. E. 152, 62 L. R. A. 477, 481; 4 Am. & Eng. Enc. Pl. & Pr. 687.

(13) Under point thirteen of the opinion, and generally touching plaintiff's alleged irregular action in conducting the trial on his own behalf, Appellants cited: Lindsay v. Pettigrew, 3 S. D. 199; State v. Kauffmann, 22 S. D. 433, 438-449; City of Shawnee v. Sparks, (Okla.) 110 Pac. 884; 1 Spelling on New Trial and Appellate Proc., Sec. 80, p. 139; Scripp v. Reilly, 38 Mich. 10; State v. Williams, 11 S. D. 64, 70, 73-74; State v. Garrigan, 11 S. D. 178, 187-190, 76 N. W. 326; People v. Wells, (Cal.) 34 Pac. 1078; People v. Searcy, (Cal.) 53 Pac. 359.

Respondent cited: L. & N. Ry. Co. v. Sullivan Timber Co., 126 Ala. 95, 27 So. 760; Kimball Bros. v. Deere, Wells & Co., 108 Iowa, 676, 77 N. W. 1041; Carey v. Switchman's Union of North America, (Minn.) 107 N. W. 129; Chicago & Alton Ry. Co. v. Johnson, 116 Ill. 206, 4 N. E. 381; Winter v. Sass, 19 Kans. 556; Texas & P. Ry. v. Raney, (Tex.) 23 S. D. 340; Goodwin v. Union Ins. Co., (Mich.) 127 N. W. 799; Gutman v. Klinek, 133 N. W. 475; Watson v. St. Paul City Railway Co., 42 Minn. 46, 43 N. W. 904; Olson v. Gjertsen, 42 Minn. 407, 44 N. W. 306.

GATES, J. Action for defamation by libel. The plaintiff was a candidate for Governor of this state at the primary election held in June, 1912. On May 25, 1912, there was published in the Sioux Falls Daily Press the following article under the heading, "South Dakota Exhanges," the same being a reprint of articles theretofore published in the Egan Express, Bradley Globe, Huronite, Faulkton Advocate, and Meadow Herald, respectively:

"That Iowa Record. Egan Express: But that there may be no undue advantage taken of Mr. Egan, we make the following offer:

"We charge that Geo. W. Egan, while residing in Harrison county, Iowa, did rape not less than two defenseless women; that

on account of his disreputable acts, Hon. O. D. Wheeler, judge of the district court, upon the complaint of a man named Bert Weed, appointed a commission consisting of three reputable lawyers, viz., Tom C. Smith, Ambrose Burke, and C. W. Kelley, to investigate and report to the court their findings; that said committee did investigate and presented to said district court a formal accusation, accusing George W. Egan of conduct unbecoming an attorney, of attempt to avert justice, of contempt of court, crimes and misdemeanors. And after reciting the matter as ascertained by the investigation, the said commission concluded the report to the judge as follows: 'Wherefore, we pray the license of said George W. Egan to practice law in the said district court be revoked and held for naught, and that the cost of the proceedings be taxed to the said George W. Egan;' that George W. Egan was not disbarred in Harrison county, Iowa, because his father-in-law, an eminent and honorable member of the Iowa bar, promised that Egan would leave the state of Iowa on condition that the disbarment proceedings should go no further. This investigating committee filed its report at 2:30 p. m. January 28, 1907, and Egan was admitted to practice in South Dakota in November the same year. Mr. Voter, draw your own conclusions.

"We might go on and prefer other serious charges, but these are enough to show any fairminded man what kind of a human being George W. Egan is, but it is unnecessary.

"Now as to our offer:

"If George W. Egan will write out a statement denying these charges, and go before a notary public and swear to it, accompanied by a notarial seal, we will publish the denial and give it the same publicity we give to the charges.

"Bradley Globe: Even if Geo. W. Egan was telling the truth, which he seems unable to do, what claim has he to become Governor of South Dakota after a four years' residence, and bringing with him the reputation of a scoundrel and a libertine. A man who was as good as chased out of his town and home state and who was disbarred from the practice of law in this state for practically stealing $10,000 from a crazy woman, who afterward died in a lunatic asylum—bah! A man must have a grudge against himself and every one else that would for a mo-

ment consider this man's candidacy for the executive head of the state of South Dakota.

"Huronite: It is the opinion of this newspaper that the state association of liquor dealers and brewers is making a mistake in promoting the gubernatorial aspirations of George W. Egan. It could no more depend on him than could others, in the event of his success. He is willing to promise all things that he would be utterly unable to deliver. Should the liquor dealers succeed in foisting him upon the people of this state, it would be held in a measure responsible and the man or organization that assumes responsibility for Egan would be taking a big chance.

"Faulkton Advocate: From everywhere around the state comes the cheering news that the voters are lining up behind Frank Byrne, regardless of faction. Egan gets some applause but Mr. Byrne, is getting the votes. And the people are onto George, George of the wavy hair and flashing eye, George of the stage tricks and tainted reputation. Mr. Byrne has long since punctured his flimsy arguments and George is now running on his personality. George may be a good show, but for Governor the people want a man of ability, sanity, and integrity, and not a vaudeville performer. Naturally they favor Mr. Byrne. And it is a fact that the keenest observers of political conditions are conceding the nomination to Mr. Byrne.

"Meadow Herald: If we wanted a man to sell gold bricks, lightning rods or school charts, we should apply to George W. Egan, prince of hot-air merchants, but just now we are interested in securing the nomination for Governor of an honest, clear-headed, constructive statesman."

On May 31, 1912, there was published in the Sioux Falls Daily Press the following article:

"Compare the Two Men.

"Frank Byrne has been a resident of the state for 33 years. He is today lieutenant governor of the state. He has been a member of the state Legislature for three terms. The kind of public citizen he is is shown by his legislative record. He is directly responsible for much of the best legislation which today is on the statute books of the state.

"Is there anything he has done as a private citizen or as a member of the state senate, or as lieutenant governor you don't

like, or that indicates that he has been or is on the wrong side of public affairs?

"No one has heard his private character attacked.

"No one charges him as being a dishonest man.

"He has never been charged with being hooked up with corporation deals.

"He has been a farmer with South Dakota farmers.

"No one is ashamed to be seen in his company.

"He has never been arrested for any alleged crime.

"He is not today before the country bemeaning citizens who may not be his supporters. He hasn't that kind of a tongue, nor disposition.

"He has never had enemies so mean as to cause him to go into courts to defend his character. He seems to be above and immune from such enemies.

"He does not believe that South Dakota is afflicted with a class of citizens who with no good reason and without cause will try to defame their fellow men.

"George W. Egan has been a resident of the state for five years.

"He came from Logan, Iowa.

"The record is that two separate cases were brought against him charging him with having committed rape.

"Disbarment proceedings were started against him shortly before he left that place.

"He was disbarred by the Supreme Court of South Dakota.

"He went before the court and asked to be reinstated. It was refused.

"He went again before the court and asked to be reinstated, all this after he had gone about the state denouncing the members of that court and writing matter in his paper denouncing them, and on this last occasion apologized for what he had said and printed and begged to be forgiven, and there acknowledged that he had been treated justy by the court and their charges against him were true.

"He says he came to South Dakota with more than thirty thousand dollars. The record shows that he paid $20.46 in taxes in Iowa the year he moved to South Dakota.

"He says that he spent his fortune defending his character in Sioux Falls.

"Never in the history of South Dakota, as state or territory, has there ever been a man who has gone about the state vilifying citizens as George W. Egan has done and is doing.

"He has abused people until he has more enemies among men, women and children of South Dakota than any other man, a hundred times over."

At the time of said publications the defendant C. L. Dotson was the proprietor and publisher, and the defendant C. B. Dotson, his son, was the editor, of said newspaper. In his complaint the plaintiff alleged that the charges contained in said articles were false and were published maliciously, and demanded damages in the sum of $50,000. The defendants answering separately, denied the falsity of the charges, denied malice, alleged that the articles were caused to be published by the editor without the knowledge or procurement of the publisher, alleged facts tending to show that the same were privileged, alleged matters tending to show justification, alleged good faith and honest belief on the part of the editor in the truthfulness of the charges, and alleged matters tending to show that the editor had reasonable cause for believing in their truthfulness, which answers cover 46 pages of the printed record. Upon the trial the jury rendered a verdict in favor of plaintiff and against the defendants for $1,000. A motion for a new trial was denied, and the cause comes before us upon a printed record of 795 pages, with 478 assignments of error, one of which contains 62 subdivisions.. Manifestly time and space forbid the consideration of all of said alleged errors. We shall therefore consider only a few of the more important questions raised.

It appears to us that the case can be best considered by first setting out such of the instructions which the court gave the jury as are material to the questions considered. They are as follows, the paragraph numbers being ours:

(4) "Understand that libel must be a false publication. So far as an article, though it may reflect on one's character, is true, it is not libel in a civil action, and the truth of the article, if established, is a complete defense; or, so far as the evidence shows that

the article was true, so far it would not constitute libel or entitle the plaintiff to any damages."

(5) "The defendants further in their answer set up various matters which do not constitute a defense, but are in the nature of mitigation of damages in case the jury should find that the plaintiff is entitled to recover and entitled to damages."

(6) "Anything or any evidence or testimony or record which has been permitted and introduced under the ruling of the court which does not prove the truth of the charges made by the defendants in their newspaper cannot be considered by you as a defense in this action, but, if considered at all, should be considered in mitigation of the damage done to the plaintiff, if you find under the evidence and these instructions that the plaintiff has been. damaged."

(7) "Regarding the evidence, you observe that there was a great deal of evidence, some of which is record evidence introduced. A word in regard to that: Respecting the records in the Daisy Hunt case and the Anna Christenson case claimed to have been brought and disposed of in the district court of Harrison county, Iowa, and the petition or claims of the said Daisy Hunt and the said Anna Christenson, respectively, in said cases, which have been introduced in evidence, you are told that you are not to use these petitions and complaints as evidence of the facts therein stated nor as evidence of the claim that the plaintiff in this suit committed the crime of rape or any other crime or offense. As to such matters, you are told that these petitions and records are merely hearsay evidence and not evidence of the fact. They were admitted only for the purpose of showing that such suits were, in fact, brought in the district court of Harrison county, Iowa, and the nature of the suits and how they were determined."

(8) "The same remark applies, gentlemen, to the record evidence introduced from the Harrison county record in regard to the proceedings in that county brought against Mr. Egan for disbarment. The petition and other allegations there are not to be taken as evidence of the facts therein stated, but as legal papers in the form of proceedings in law bringing the matter before the court for determination."

(9) "In this class of cases, where the plaintiff was a candidate for a public office at the time of the publication of the article in

question, and where the articles themselves relate to him as such candidate, no recovery can be had against the defendants for the publication, however false they may be, provided the defendants honestly and in good faith, without express malice, believed, under circumstances warranting such belief, the articles to be true, although the defendants were, in fact, mistaken. Both bad faith of the defendants and the falsity of the articles in whole or in part must coexist to entitle the plaintiff to recover in this action."

(10) "The plaintiff being a candidate for nomination to the office of Governor of this state at the time of the publication in question, and the defendant C. L. Dotson being the publisher of a newspaper, and the defendant C. B. Dotson being the editor thereof, and both said defendants being residents and electors of the state of South Dakota, and being therefore interested along with all other electors and citizens of the state in the choice of a proper person for that office, they were entitled to consider and discuss in the said newspaper the character, reputation, and qualifications of the plaintiff for such office."

(11) "You are instructed that the law is that the fitness and qualifications of a candidate for an elective office may be the subject of the freest scrutiny and investigation, either by a proprietor of a newspaper, or by a voter, or a person having an interest in the matter, and that much latitude must be allowed in the publication for the information of voters of the character and the fitness of a candidate for office for the place he seeks. Nor will such a publication be actionable without proof of express malice, although it may be harsh, unjust, and unnecessarily severe; for these are matters of opinion, of which the party making the publication has a right to judge for himself. In the case of such a publication, the occasion rebuts the inference of malice which the law would otherwise raise from the falsity of the article, if it be false, and no right of action exists even though the character of the plaintiff has suffered in this case, unless he is able to show the existence of actual malice."

(12) "Malice cannot be inferred or presumed from the mere fact of the publication of the articles or either of them in question. It must be shown or established by some evidence outside of and beyond the fact of the publication of the articles themselves, and,

unless actual malice is so shown, your verdict must be for the defendant."

(13) "To constitute actual or express malice which the plaintiff must establish to your satisfaction to entitle him to recover, he must show by a preponderance of the evidence that in publishing the articles in question, or one of them, the defendants made use of the privilege which is accorded to all newspapers to discuss the moral character and the qualifications and fitness of candidates for office, as a cover or a means or the occasion for publishing false statements, if you find the statements so published were in any material respects false."

(14) "The articles in question are not privileged, regardless of their contents, and even though portions or all of them relate to the plaintiff's qualifications for the office of Governor, provided you find that they were maliciously published or published with malice on the part of these defendants, as it is the law that, if express malice is shown to exist at the time of the publication of the articles, they are not privileged within the meaning of that term given, and, if they were false and untrue, or any material portions of them false or untrue, and the plaintiff has sustained damages because of such untruthful portions of said articles as in other portions of these instructions defined, the plaintiff would be entitled to your verdict for such damages."

(15) "Actual malice in uttering the false statements may consist either in a direct intention to injure plaintiff or in a reckless disregard of his rights and the consequences that may result to him."

(17a) "And, if you find from all the facts and circumstances and evidence in this case that the articles complained of were published by the defendants with malice, and damages resulted to the plaintiff as an approximate cause thereto, you should then proceed to estimate the damage done to the plaintiff and in this connection you should consider his profession and his standing as a lawyer and lecturer, his standing as a citizen in the community, and all other facts and circumstances which would enable you to reach a true and just verdict in the premises."

(21) "Of course, the burden of proof rests upon the plaintiff to make out his case by a preponderance of the evidence. Upon any affirmative allegation of the defendants' answer in regard to

whether the matter was true or false, the burden rests upon the defendants to establish that issue."

Appellants excepted to paragraphs 5, 6, 7, 8, 13, 15, 17a, and 21.

[1] There are two radically divergent views of the law of privilege or criticism of a candidate for office:

"The weight of authority seems to favor what may be considered as the narrow view, which is to the effect that, while fair criticism and comment on the merits and demerits of candidates for office are privileged, if made in good faith, false statements of facts are not privileged." Ann. Cas. 1914C, 997, note.

This so-called narrow view is supported by decisions from the United States courts and from a majority of the states. It is chiefly such decisions that respondent has cited in his brief and upon which he relies.

The other view is thus stated:

"What may be properly called the liberal view, and one which has the sanction of considerable authority, is that a charge made against a candidate for office is privileged if the person making it believes in the truth of the charge and has probable ground for his belief, for which purpose hearsay suffices, regardless of the fact that the charge is a false statement of fact." Ann. Cas. 1914C, 1000, note.

In other words, if a publication is not malicious, it is privileged under this rule, whether true or false. This view obtains in Iowa, Pennsylvania, Minnesota, Kansas, North Carolina, and Texas. In the year 1900 this court determined that the so-called liberal view conformed to a proper interpretation of our Constitution (art. 6, § 5) and of subdivision 3, § 31, of our Civil Code. This view has been consistently adhered to ever since, and is the settled law of this state. Myers v. Longstaff, 14 S. D. 98, 84 N. W. 233; Boucher v. Clark Pub. Co., 14 S. D. 72, 84 N. W. 237; Ross v. Ward, 14 S. D. 240, 85 N. W. 182, 86 Am. St. Rep. 746; Rood v. Dutcher, 23 S. D. 70, 120 N. W. 772, 20 Ann. Cas. 480; Schull v. Hopkins, 26 S. D. 21, 127 N. W. 550, 29 L. R. A. (N. S.) 691; Howe v. Thompson, 35 S. D. 1, 150 N. W. 301; Niblo v. Ede, 35 S. D. 359, 152 N. W. 284.

The question of what is or what is not libel is largely controlled by constitutional and statutory provisions. In many of

the states we find no legislative definition of "libel," but South Dakota has such definition. Section 29, C. C., says:

"Libel is a false and unprivileged publication by writing, printing, picture, effigy or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

Again, many of the states do not have the legislative enactment contained in subdivision 3 of section 31, C. C., which is as follows:

"A privileged communication is one made:   *   *   *

"3. In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information."

With such provision omitted, and without the above legislative definition, the law of libel in this state would be as contended for by respondent—i. e., the so-called narrow view. But subdivision 3 of section 31, C. C., and other subdivisions of that section were enacted for a purpose; viz., to prescribe under what circumstances false statements will not constitute civil libel. Manifestly the decisions of courts from states which do not have such statutory provisions are not persuasive in determining the law as to privileged communications. With the wisdom of such legislative enactments the courts cannot be concerned. It must be remembered, however, that by our Constitution and statutes it is left to the jury to find, from all of the evidence, whether or not a defendant acted maliciously; and they may find that he so acted if they are satisfied that he did not make such an investigation as to the truth of the charge as the nature of such charge and all the surrounding circumstances demanded. No one can have any doubt but that juries will hold those who seek to defend on the ground of privilege to a line of duty, pertaining to the investigation of the truth, which will be strictly in accordance with their ideas of what a defendant should have done in view of the gravity of the charges made.

[2] Testing the instructions by our statutes as interpreted

by the decisions of this court above cited, we find the law clearly and admirably stated in instructions 4, 9, 10, 11, 12, and 14, and in instruction 13, except as hereinafter qualified, but instructions 5 and 6 flatly contradicted those rules of law, and seem to have been given under the theory of the narrow view above stated. The matters covered by instructions 5 and 6 were admissible, not only in mitigation of damages, but as tending to rebut malice. Instructions 5 and 6 could not have failed to confuse the minds of the jury as to the law of the case, and were extremely prejudicial.

[3] The same may be said of the exclusion of evidence offered by defendants touching the publication of certain articles in the Sioux City News and Sioux City Tribune, and much other evidence, tending to show the reputation of respondent, of which the defendant editor claimed to have had knowledge, and upon which he claimed to have relied when he caused the articles in question to be published. The defendants were entitled to offer any evidence which tended to show their good faith in making these publications, and which tended to show they had reasonable cause to believe the articles were true, not only in mitigation of damages, but as tending to rebut express malice. Proof of prior publications in newspapers, proof of prior circulation of pamphlets containing matter similar to the articles complained of, proof of the reputation of plaintiff at the time of the publications, proof of former court records, and all proofs of like nature were admissible to disprove malice upon a showing that defendant editor had knowledge of them at the time he caused the articles to be published, *and that he made such reasonable investigation of their truth as the circumstances required.* Marks v. Baker, 28 Minn. 162, 9 N. W. 678; Hewitt v. Pioneer Press Co., 23 Minn. 178, 23 Am. Rep. 680; Mayo v. Sample, 18 Iowa, 306; Coogler v. Rhodes, 38 Fla. 240, 21 South. 109, 56 Am. St. Rep. 170; Wrege v. Jones, 13 N. D. 267, 100 N. W. 705, 112 Am. St. Rep. 679, 3 Ann. Cas. 482. This is true even to proof of general reputation known to defendant, and is true for the reasons lately announced in Roskay v. Hessenius, 36 S. D. 163, 153 N. W. 936. Such matters were also admissible in mitigation of damages, regardless of knowledge on the part of defendant, because a reputation already tarnished is not as valuable as one which is perfectly sound. Wetherbee v. Marsh, 20 N. H. 561, 51 Am. Dec. 244. In this view instructions 7 and 8

were also unduly restrictive. The evidence referred to therein was also admissible as bearing upon the question of express malice.

[4, 5] We are of the opinion that instruction 15 was also unduly restricted and misleading. In the first place, the language of the first line assumes that some of the statements were false, which was a question for the jury. In the second place, the words "direct intention to injure plaintiff" should have been qualified or further explained. It is only the injury contemplated by section 29, C. C., supra, for which plaintiff could recover damages. If the statements were false, but made in good faith, for the purpose of defeating plaintiff for the nomination for Governor, they did not amount to evidence of express malice, although the effect of losing the nomination may have been an injury to plaintiff. They had a perfect right to use their utmost endeavors to defeat the nomination of plaintiff if they considered him unfit for the office, provided they acted without malice. The fact of his defeat was not to be considered by the jury in estimating his damages. It is not enough that there be a "directed intention to injure plaintiff" in order to constitute malice. The act must be "wrongfully and intentionally done with an evil mind and a wish to injure." Bouvier, Law Dict.; Baxter v. Campbell, 17 S. D. 475, 97 N. W. 386; Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342, 20 L. R. A. 440; Davis v. Hearst, 160 Cal. 143, 116 P. 530.

[6] As also bearing upon the question of malice, we may observe that, while proof of dislike or ill will is competent evidence upon the question of malice, still the court should have instructed the jury that dislike or ill will may exist, and yet actual malice be entirely wanting. If defendants honestly believed in the truthfulness of the charges published, they might, as good citizens, entertain a feeling of dislike and ill will towards defendant. It would be a strange rule of law that would sanction a verdict in an action for libel against a defendant who disliked the plaintiff, who believed in the truth of the charges, who had reasonable cause for such belief, and who published the charges from good motives, and, on the other hand, would not sanction a verdict against one who was a total stranger to plaintiff, who entertained no feeling of dislike or ill will toward him, and who, actuated by the same motives, and believing in the truth thereof, and with the same

cause for such belief, published the same charges. The jury should have been instructed in accordance with defendants' proposed instruction No. 34.

[7] Instruction 13, standing alone, would be misleading. If between the word "defendants" and the words "made use of the privilege" near the middle of that instruction the learned trial court had inserted the following clauses: "Knowing the same to be false, or in reckless disregard of its truth or falsity, intentionally"—then that instruction would have been entirely unobjectionable.

[8] We do not find that the exception to instruction 17a was argued; hence that matter is not herein considered.

[9] Instruction No. 21 was in accord with the decision of this court in Boucher v. Clark Pub. Co., supra, wherein it was held that the burden was upon the defendant to prove the truthfulness of the charge.

[10] Defendants, both by objections interposed to evidence offered and by instructions requested, sought rulings to the effect that, even though malice be established as to one of the defendants, yet : (1) It must still be shown that such malice was malice which was connected with the publication; (2) proof of actual malice on the part of one defendant is insufficient to sustain a verdict against the other—in other words, the malice of one defendant cannot be imputed to the other. It is perfectly clear that, where actual malice is an ingredient of the offense, the defendants are right in their contentions. A. may be an enemy of B., and yet before publishing a qualifiedly privileged article concerning B. he may make every reasonable investigation into its truth, and in all good faith publish the article believing it to be true. A. would be no more liable for such publication than C. would have been under the same circumstances, even though C. was not unfriendly to B. Of course, the enmity of A. may be shown as bearing upon the question of malice in the publishing of the article, but no cause of action is established unless the malice of A. is proven and found to be the real moving cause leading to the publication. In the case before us there is absolutely no evidence that the publisher directed either publication or knew of them until after they were published. If, then, he had malice toward plaintiff, such malice was unconnected with the publication unless there is evidence that

he ratified the acts of his agent, or unless it be shown that he was reckless in the extent of power conferred upon the editor. Malice cannot be imputed to one defendant from proof of malice of the other. No conspiracy is alleged or proved. The publisher of a paper, knowing of the absolute falsity of certain publications clipped from other papers, and moved by a spirit of malice toward the subject of such publications, may turn them over to the editor with a demand that they be published together with an editorial based thereon. The editor, who is not advised of the publisher's motive or his belief in the falsity of the articles, but who himself has made a careful and reasonable investigation of the truth of the articles, and has arrived at an honest belief in their truth, obeys the instructions of the publisher. The malice of the publisher cannot be imputed to the editor. Nothing but proof connecting the malice of the publisher with the editor's volition in publishing the articles and editorial will render the editor liable. The reverse of this is true. If the publisher, in good faith, believing in the truth of it, should direct the editor to write an editorial along a certain line, and the editor, knowing that such an editorial would be false, yet, prompted by malice, and without disclosing to the publisher his knowledge and his motives, publishes such editorial, while the editor would be holden therefor, the publisher would be no more holden than if he had been both publisher and editor and in good faith and without malice had published the article. Krug v. Pitass, 162 N. Y. 154, 56 N. E. 526, 76 Am. St. Rep. 317. Keeping in mind the above propositions, the record reveals: (a) That there was much evidence received that was absolutely immaterial and irrelevant; (b) that the trial court erred, in not then and there ruling, when certain evidence was received, that it was only received as against the particular defendant to whom it purported to relate; (c) that the trial court erred in not giving some of the requested instructions.

[11] The truth of nearly all of the charges contained in the second publication and of some of the charges contained in the first publication was established by uncontradicted testimony. The trial court should have directed the jury to disregard and eliminate from the case those matters so proved to be true.

[12] In his opening statement to the jury before evidence

31—Vol. 36, S. D.

was offered, the plaintiff, as his own counsel, grossly violated permissible practice. Section 255, C. C. P., provides as follows:

"When the jury has been sworn, the trial must proceed in the following order, unless the judge, for special reasons, otherwise directs:

"1. The plaintiff, after stating the issue and his case, must produce the evidence on his part.

"2. The defendant may then open his defense, and offer his evidence in support thereof."

Instead of complying with sudivision 1 of this section, the plaintiff, before the taking of evidence had begun, and when purporting to make his opening statement to the jury, gave unsworn testimony in detail, not as matter he expected to prove, but as actual facts, coming from his own mouth as an unsworn witness, in which the statements were almost entirely made in the first person singular. The defendants interposed 52 objections thereto, which were overruled by the court. This opening statement, with the objections and rulings, covers 16 pages of the record. It is not feasible to reproduce the same in this opinion. Suffice it to say that the function of the opening statement is to briefly state the issues and briefly outline what the plaintiff expects to prove. The right of a person to try his own case does not contemplate the privilege of giving testimony three times in the same case, viz: As an unsworn witness in the "opening statement"; as a witness under oath; and again in his closing argument. In Zucker v. Karpeles, 88 Mich. 413, 50 N. W. 373, the court said:

"We do not think it proper for counsel, in opening to the jury, to enter into a detailed statement of the testimony by which he expects to substantiate the facts of his case. He should call the attention of the jury to the salient points and what he expects to establish, and not repeat to the jury the evidence by which he expects to prove the points claimed; the object of the opening being to assist the jury to understand the testimony as it is introduced and the bearing it has upon the issues involved. We think, when counsel confine themselves to these objects, they will find no disposition upon the part of the courts to interfere with their opening."

See, also, Abbott's Civ. Jury Trials (3d Ed.) 148.

[13] It might be fairly urged that such opening statement, if

made by an attorney for plaintiff, instead of by plaintiff himself, would be nonprejudicial, even though improper in style and contents, were it not for the fact that it contained statements not afterwards proven, nor attempted to be proven, matters as to which proof was inadmissible, and much in the way of argument, the purpose of which could only have been to arouse prejudice in the minds of the jurors. Following are examples of some of such statements:

"Gentlemen of the jury, we are glad when our fellow man rises; but we are not glad when they walk over the prostrate form of or assassinate the character and destroy the hopes and the honorable life of a fellow citizen. *   *  . *

"Gentlemen of the jury, the court will tell you—I know the law, and you are the judges of how this would affect a man, taking into consideration his life, his scholarship, his professional standing as a lawyer, as a lecturer, and all those things. What crime more heinous or offensive to charge a man with! He would not dare to speak unkindly of me or harshly of me on the streets of your city; but he drives a dagger into my heart when I am away from home.  *   *   *

"Accusing me of stealing $10,000—not blowing up a bank, because that would take courage, but of stealing $10,000 from a crazy woman, and of raping at least two defenseless women.

"When I went from Watertown to Lake Campbell, men who had seen this article said to me.  *   *   *

"They could not support me. I came to Sioux Falls. Men said, 'Our wives and daughters deny us the right to support you.' *   *   *

"A rapist, a kind of a human they burn, that is the kind of a man who is running for Governor—a rapist."

We are entirely satisfied that the effect of this kind of an opening statement was extremely prejudicial to defendants.

[14-18] We next come to the question of the misconduct of plaintiff as his own counsel in his argument to the jury. The condensed epitome of the portions objected to by defendants as improper and outside of the evidence, and as an irregularity and misconduct, covers more than 14 pages of the record, and is manifestly too long to reproduce. It was replete with matters not in evidence and beyond legitimate inference from facts in evidence.

The argument was mostly addressed to the jury, but sometimes defendant addressed the audience. It was calculated to arouse the passion and prejudice of the jury. What was said by this court of this plaintiff's argument in the case of State v. Kaufmann, 22 S. D. 433, on pages 448, 449, 118 N. W. 337, is largely applicable here. Some of the objectionable utterances are as follows:

(a) "Up to this time there has been nothing derogatory to Mr. Egan in the paper, and the 20th day of May, 1912, Mr. Byrne came down here, and what was said I don't know; but I'll tell you what I do know Byrne came here. The article was published. Egan's friends are driven away from him. Byrne is elected. Mr. Dotson is made a member of the board of charities and corrections."

There was no evidence that Mr. Byrne went to Sioux Falls on May 20, 1912, or at any time, and this same assertion was also made by plaintiff in his opening statement to the jury:

(b) "I know what he was trying to get the Becker woman to say, and stopped him by physical force, and I would have stopped him by physical force had I been there when he took the Wilson deposition."

The Becker deposition was not offered in evidence, nor was there any evidence that such a deposition had ever been taken, and plaintiff had no right to refer to it. The Wilson deposition was offered in evidence. Not only was it grossly improper for plaintiff to tell the jury that he stopped the taking of a deposition by physical violence, but also that he would have similarly stopped the taking of the other one if he had been present. We take this opportunity of saying that, in making such statement, plaintiff confessed that he had once committed and, if present at the opportune time, would again have committeed, an act which was not only a most serious breach of his duty as an officer of the court, but was a criminal offense.

(c) "My clients have been the poor; the girl with the little fingers lost; it has been the boy who has been crippled by the railroad and—

"The street railway company and such clients do not come to me. I am the lawyer of the poor. I am willing to take a chance, and if they don't get anything I don't—

"No man was ever turned away from my office because he did not have money."

What relevancy has the above to this cause of action? It was outside the evidence, and clearly appealed to the passions and prejudices of the jury.

(d) "I was disbarred by two men, Dick Haney and Mr. Corson, and just as soon as the people got a chance they retired them, and that is the truth."

The opinion of this court in the cause In re Egan, 22 S. D. 355, 117 N. W. 874, which was offered in evidence in the present case, disclosed fully the facts which caused plaintiff's disbarment. Moreover, upon the hearing of his petition for reinstatement, the record of which was likewise offered in evidence, the following appears:

"On the hearing of the petition, after making an extended statement, the petitioner, who was sworn and examined by the presiding judge, testified as follows: 'Q. In reading your petition, and from what you have already stated, I take it that it was your intention not only to apologize to the court, but to retract anything that you may have said that in any way reflected upon the integrity of the court? A. That was my intention at the time I filed the petition, and is my intention now. Q. And in so retracting do you do it believing at this time that such action as may have been taken by this court in any of the proceedings concerning which you may have criticized the action of the court was done conscientiously by the court, without any prejudice as against you, or any wrongful influence from the outside, or wrong motive on the part of the court? A. I had that in my heart and mind, and have it now, to retract in that sense. Q. And you do believe, do you, at the present time, that this court has acted conscientiously, from proper motives, in all that it may have done, whether in or against your interests, in any of these proceedings? A. I believed when I filed my petition, and believe now, that the court acted conscientiously and honestly on all the facts that it had before it, or could get before it, touching my affairs, whether for me or against me." In re Egan, 27 S. D. 16, 18, 19, 129 N. W. 365.

Surely there was no occasion to cast aspersion upon the integrity of the eminent jurists named by him in his argument.

In the course of his argument, plaintiff turned to the audience assembled in the courtroom and said, "I know what this audience thinks and what every self-respecting man thinks," and then, turning to the jury, said, "And I know what you think; that I should have taken a club and struck him down" (referring to defendant C. L. Dotson).

[19] Further in his closing argument to the jury plaintiff's assistant counsel told the jury that plaintiff had taken the depositions of two Catholic priests to be offered in evidence on behalf of plaintiff; that defendants had appeared and cross-examined the witnesses, and had then procured an order suppressing the depositions because the notice of taking the same had not been served in time. This was outside the record and was reprehensible and prejudicial.

[20] In an early Wisconsin case Chief Justice Ryan, in Brown v. Swineford, 44 Wis. 282, 28 Am. Rep. 582, most felicitously stated the law as to the true field of argument to the jury. We quote therefrom with approval the following:

"The profession of the law is instituted for the administration of justice. The duties of the bench and bar differ in kind, not in purpose. The duty of both alike is to establish the truth and apply the law to it. It is essential to the proper administration of justice, frail and uncertain at the best, that all that can be said for each party, in the determination of fact and law, should be heard. Forensic strife is but a method, and a mighty one, to ascertain the truth and the law governing the truth. It is the duty of counsel to make the most of the case which his client is able to give him; but counsel is out of his duty and his right, and outside of the principle and object of his profession, when he travels out of his client's case and assumes to supply its deficiencies. Therefore it is that the nice sense of the profession regards with such distrust and aversion the testimony of a lawyer in favor of his client. It is the duty and right of counsel to indulge in all fair argument in favor of the right of his client; but he is outside of his duty and his right when he appeals to prejudice irrelevant to the case. Properly, prejudice has no more sanction at the bar than on the bench. But an advocate may make himself the alter ego of his client, and indulge in prejudice in his favor. He may even share his client's prejudices against his adversary,

as far as they rest on the facts in his case.   But he has neither
duty nor right to appeal to prejudices, just or unjust, against his
adversary dehors the very case he has to try.   The very fullest
freedom of speech within the duty of his profession should be ac-
corded to counsel; but it is license, not freedom of speech, to travel
out of the record, basing his argument on facts not appearing,
and appealing to prejudices irrelevant to the case and outside of
the proof.   It may sometimes be a very difficult and delicate duty
to confine counsel to a legitimate course of argument.   But, like
other difficult and delicate duties, it must be performed by those
upon whom the law imposes it.   It is the duty of the circuit courts
in jury trials to interfere in all proper cases of their own motion.
This is due to truth and justice.   And if counsel persevere in
arguing upon pertinent facts not before the jury, or appealing to
prejudices foreign to the case in evidence, exception may be taken
by the other side, which may be good ground for a new trial or
for a reversal in this court."

[21] Lastly we come to the question of newly discovered
evidence as a ground for a new trial.   Mrs. Wilson in her deposi-
tion had given evidence tending to show that plaintiff had made a
criminal assault upon her in his office at Logan, Iowa.   It ap-
peared from her deposition that she was engaged as a traveling
solicitor for a childrens' home society, and that she resided at dif-
ferent times at Atlantic, Des Moines, and Ft. Madison, Iowa, and
at La Crosse, Wis.   At the very conclusion of this trial plaintiff
testified that he had written to H. M. Duval, Atlantic, Iowa, H.
M. Boorman, Atlantic, Iowa, Younker Bros., Des Moines, Iowa,
J. R. Fraley, Ft. Madison, Iowa, and John F. Doherty, La
Crosse, Wis., to find out something about Mrs. Wilson and to
ascertain her reputation, and that he had received no replies to
such letters.   Upon the witness stand he testified that there was
no such person as Mrs. Wilson; that she was "what is known
among detective circles as a dummy."   In his closing argument
he said:

"Where is Mrs. M. E. Wilson?   If she lives in Omaha, a
telegram would have brought her here.   Why didn't they bring
her here so you could see her?   I told him [referring to counsel
for defendant] from the witness stand that that witness [referring
to Mrs. M. E. Wilson] was a dummy, and I know it as well as I

can know anything. Why didn't they bring her here. They could have sent a telegram to Omaha, if she lived there, and got her here this morning. If there was any Mrs. M. E. Wilson these letters would have gotten a response."

It appeared that information of this transaction with Mrs. Wilson was in the possession of the defendant editor at the time of these publications, and was one of the matters defendants relied upon in making them. Upon the motion for a new trial it appeared that H. M. Duval had received such letter from plaintiff and had answered it by asking the purpose of the inquiry, and that he had received no reply from plaintiff; that H. M. Boorman had received such letter from plaintiff, and had promptly answered it, stating that Mrs. Wilson was a lady of good character and bore a good reputation; that J. R. Frailey, of Ft. Madison, Iowa, and John F. Dougherty, of La Crosse, Wis., had received no such letters from plaintiff. We are convinced that the trial court should have granted a new trial upon this showing of newly discovered evidence, if for no other reason. If the affidavits of these parties were true, the plaintiff committed perjury in relation to one of the most important matters within the scope of the defense.

The judgment and order denying a new trial are reversed, and the cause is remanded for a new trial.