### Weick v. Commonwealth.

(Decided January 18, 1924.)

### Appeal from Jefferson Circuit Court.

1. Homicide—Facts Held Not to Authorize Giving of a Manslaughter Instruction.—In a prosecution for homicide, where there was no difficulty, no altercation, and no word passed leading up to the

shooting, court did not err in refusing to give instruction on manslaughter.

2. Homicide—Court Did Not Err in Refusing to Instruct Upon Effect of Intoxication.—Where the court instructed generally that jury should acquit defendant if they believed from the evidence he was of unsound mind, without reference to what might have caused or brought it about, defendant cannot complain that court refused an instruction defining the effect of defendant's alleged intoxication at the time of the killing, or as to his alleged excessive indulgence for a long period of years.

3. Criminal Law—Voluntary Drunkenness as Defense.—At common law, voluntary drunkenness at the time of the commission of a crime was regarded as an aggravation rather than an extenuation, but the rigor of this common law rule has been modified, and, while voluntary drunkenness is no defense, if at the time of its commission the defendant was intoxicated to such an extent that he was wholly deprived of his reason and had not, because of such intoxication, sufficient mental power to entertain the malice or have the necessary intent required to constitute that crime, he should be acquitted, because that essential element of the crime was nonexistent.

4. Homicide—Getting Drunk to Nerve Self up no Defense.—One who gets drunk voluntarily, in order to nerve himself up to the commission of a homicide, which he has theretofore determined to do, may not rely upon his drunkenness as a defense.

5. Criminal Law—Argument of County Attorney Not Improper.—In a homicide case, argument of county attorney that a finding of insanity "does not mean that he will go to central asylum; it means that as soon as that verdict shall be read . . . he stands up and is as free a man, so far as a moral responsibility is concerned, as any of you men," only stated an obvious fact, and did not mean that if defendant was found to be insane, it would not be the duty of the court or the authorities to have him so adjudged and properly incarcerated in a state institution.

6. Criminal Law—Mere Fact Jury Attended Motion Picture Show Not Ground for New Trial.—The mere fact that the jury, in charge of the sheriff or his deputy, attended a picture show, is not sufficient ground upon which to grant a new trial.

HUGGINS & OLDHAM for appellant.

THOS. B. McGREGOR, Attorney General, and CHAS. W. LOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

Appellant was indicted, charged with the murder of William Oelke, and upon his trial was found guilty and sentenced to death.

There was no contradiction in the evidence as to any material fact involved in the killing, but defendant in the trial court and in this court relies exclusively upon the defense of insanity, and incidentally, of drunkenness at the time of the killing, as well as long continued excessive use of intoxicants which produced a state of insanity, as claimed.

The admitted facts show a flagrant case of assassination, as well as a preconceived determination by appellant to kill decedent, and plainly disclose the motive back of that determination.

Prior to the 7th of October, 1922, the parties all lived in the same neighborhood in Jefferson county, a few miles from the city of Louisville. Some two or three years before that time appellant's wife had died, and for several months next preceding the killing there had sprung up between appellant and decedent's wife at least a close friendship. It appears there had been some dissension or dissatisfaction in the Oelke household, and the wife had determined to bring a suit for divorce, and on the day before the killing appellant had taken the wife and her daughter to Louisville, and had gone with them to the office of a lawyer who was consulted about the bringing of the divorce action, and the petition was actually prepared on that day. It appears to have been contemplated by Oelke's wife that during the pendency of the proposed divorce action she would return to her father's home at some point in Indiana, and she expected to make that trip in a day or two. Accordingly in preparation for her departure she, through appellant, arranged with a neighbor to keep her cow during her absence, and she also sent to appellant's home, to be kept for her by him, a lot of bedclothes; but the record fails to disclose that Oelke had any notice whatever of her plans for a visit to Indiana, or the bringing of the divorce suit. The evidence further discloses there were two entrances to the Oelke home, one called the front entrance, and the other the back entrance, and that when Oelke was at home appellant in going to that place always used the front entrance, but when he went there in Oelke's absence he used the back entrance, presumably for the reason that it was not so public.

On the very day of the killing, only a few hours before, appellant desiring to know whether Oelke was at home, sent his young son to the Oelke home to find out, and upon

the latter's report that Oelke was not there, he visited there, using the less frequented route, and remained for some thirty minutes. While there, in speaking of Oelke to Oelke's wife, he said, ''I have a notion to kill him,'' to which she responded, ''You are so drunk you don't know what you are talking about, you had better go on home.'' The wife further testified that upon another and previous occasion Weick had said that if Oelke hurt her or any of the children he would ''lay the road for him;'' but the wife testified Oelke never did hurt her or any of the children. After remaining at the Oelke home for some thirty minutes defendant left there and returned to his own home, and thereafter he and his young son got into a Ford machine and he either put in the machine himself, or required the boy to put into the machine, a small 22 rifle, and in addition he had in his pocket a pistol which he owned. They drove to several places, but among others they went to a store nearby, or at least the boy did, and bought some cartridges for the rifle. Oelke was at work some distance away, and ordinarily came home from his work between half-past five and six; and about that time appellant caused his son to drive him to an old schoolhouse along the road where Oelke would pass, which schoolhouse was either abandoned or not in use at the time, and there appellant left the machine and stationed himself in or about the schoolhouse near the road. He then caused his young son to drive the machine back in the direction from which it was thought Oelke would come, and directed him when he saw him coming to return in the machine and notify him. When appellant left the machine he not only had his pistol with him, but he took the 22 rifle. The boy in a short time came back and notified him that Oelke was coming, and he then directed the boy to drive the machine up the road a short distance, which he did. Oelke came along shortly riding a bicycle, and defendant from his concealment in or near the schoolhouse first fired at Oelke with the 22 rifle and struck him in the arm, whereby he was caused to fall from his wheel; it appears that after the first shot with the rifle it jammed, or for some reason would not work, and he then threw it down, ran out into the road in front of Oelke, who was trying to get away, and shot at him with the pistol, but missed him the first shot. He then shot at him a second time with the pistol and the bullet reached a vital spot, and he died almost instantly. Appellant then dragged

Oelke's body into some high weeds near the roadway, and rejoined his son in the machine nearby, and left the place. In some way, however, he dropped his pistol and a short time thereafter he and his son returned to the place of the shooting, presumably for the purpose of finding the pistol. In the meantime, however, the body had been discovered, and several other persons had congregated at the place, and appellant did not at that time find his pistol, but it was found a day or two afterwards by other persons with two chambers empty.

There is no evidence of any difficulty or difference of any kind between appellant and Oelke previous to the killing, but the evidence points unmistakably to a great friendship, if not criminal intimacy, existing for some time between appellant and Oelke's wife.

Appellant did not testify on the trial, nor did he introduce any witness except upon his defense of insanity, and to show drunkenness at the time, and his excessive use of intoxicants through a long period of time.

The trial court instructed only on murder and the defense of insanity, but declined to give a manslaughter instruction, or any instruction defining the effect of appellant's alleged drunkenness at the time, or the effect of his alleged excessive use of intoxicants for a long period of time.

Three grounds for reversal are relied upon:

1. The refusal of the court to give a manslaughter instruction, or an instruction defining the effect of defendant's alleged intoxication at the time, or as to his alleged excessive indulgence in intoxicants for a long period of years.

2. Because of the alleged improper argument of the attorney for the Commonwealth, to which defendant at the time objected.

3. Because it was prejudicial error for the jury during the trial of the case to be permitted to go to a picture show.

On the first proposition it is apparent from the evidence that nothing occurred at the time of the killing authorizing the giving of a manslaughter instruction; there was no difficulty, there was no altercation, there was no word passed leading up to the shooting, which on any theory could have justified the giving of such an instruction. On its face the killing was either a premeditated murder for the purpose of getting rid of the decedent

because he stood between appellant and his realization of the enjoyment of the decedent's wife's affections, or it was the act of an insane man who was incapable of distinguishing between right and wrong, and therefore such an act as the law will not hold him responsible for.

But the argument is that as there was some evidence defendant was at the time under the influence of intoxicants, and that for a long period of years he had habitually used intoxicants excessively to such extent as that it might have affected his state of mind, there should have been either an instruction upon manslaughter or an instruction defining or setting forth the nature of the conclusions which the jury might be authorized to reach if they believed he was intoxicated either at the time of the killing, or that such excessive use of intoxicants through a long period had affected his sanity.

Manifestly there is a distinction between what may be termed acute intoxication brought about by over-indulgence in intoxicants shortly before the occurrence, and such state of mind affecting sanity as might have been produced by over-indulgence in intoxicants through a long period of time before the occurrence. In the one case the effect upon the nerves and sensibilities is only temporary, and will shortly pass away, while in the other a permanent state of insanity might be produced by such long continued and excessive use.

There is no complaint of the form or substance of the instructions on insanity; they correctly informed the jury that if they believed from the evidence that at the time defendant was of unsound mind they should acquit him, but were told in a subsequent instruction that defendant could not be excused on the ground of insanity unless the jury believed from the evidence that he was at the time "without sufficient reason to know what he was doing, or had not sufficient reason to know right from wrong, or that as the result of mental unsoundness he had not then sufficient will-power to govern his action, by reason of some insane impulse which he could not resist or control."

It will be observed that these instructions do not require that the insanity or unsoundness of mind shall result from or come from any particular cause, but authorize an acquittal if the insanity or unsoundness of mind existed at the time of the killing without reference to what might have caused or brought it about. In other words,

the jury was authorized by that instruction to acquit the defendant if they believed from the evidence he was of unsound mind, whether that condition was brought about by long continued excessive use of intoxicants or any other cause whatsoever. It must be apparent, therefore, that the instructions were sufficiently comprehensive to, and in fact did, authorize an acquittal of defendant if the jury believed he was insane because of the long continued and excessive use of intoxicants.

At common law voluntary drunkenness at the time of the commission of a crime was regarded as an aggravation rather than extenuation; but the rigor of this common law rule has been modified, in some states by statute, and in others by judicial interpretation. The modern rule appears to be that while voluntary drunkenness is no defense to the commission of a crime, if at the time of its commission the defendant was intoxicated to such extent as that he was wholly deprived of his reason, and had not because of such intoxication sufficient mental power to entertain the malice, or have the necessary intent required to constitute that crime, he should be acquitted because that essential element of the crime was nonexistent.

In the earlier opinions in this state there was much confusion in dealing with this character of defense, but in the later cases the principles we have stated have been fully recognized and applied.

The case of Harris v. Commonwealth, 183 Ky. 542, is in its essential features strikingly similar to this. In that case the defendant, who was separated from his wife, and who after the separation had behaved badly toward her, for which he had been arrested and fined, sought her out, having first purchased cartridges for his pistol, and having waited and watched for her near her working place. Finally when he came up with her he deliberately shot and killed her, without apparent cause. In that case, as in this, there was no attempt to justify or extenuate the commission of the crime, the only defense being insanity, or both insanity and drunkenness, the only difference being there the defendant testified he had no recollection or knowledge of having shot his wife, while in this case the defendant did not testify. There in substance the same ground of reversal was urged as here, that is, that defendant was entitled to a manslaughter instruction, the argument being that his state of intoxication at the time

being evidence of an absence of malice justified the manslaughter instruction.

The court in that case denied the contention, and in doing so held:

(a) That testimony by a defendant that he did not consciously kill his victim, but against whom it was proven he entertained malice or ill-will, has probative value only in support of the defense of insanity to show the absence of any motive whatever, but is of no probative value to show the absence of malice in a sane person;

(b) That evidence of drunkenness of one accused of murder, even where malice is proven, is admissible for consideration of the jury in determining whether the punishment should be death or only life imprisonment, but such evidence cannot reduce murder to manslaughter where pre-existing malice toward the deceased is proven; but may have that effect only where there is no proof, but merely a legal presumption of malice, and

(c) That an instruction upon manslaughter is not authorized by evidence of drunkenness at the time by the defendant, who without justification sought out and killed one against whom he was shown to have entertained a settled ill-will or malice.

In the progress of that opinion the court said:

"Reason and human experience possibly justify the injection of drunkenness to show an absence of motive, under certain circumstances, as where a man kills a friend or a stranger, rationally explainable only as the result either of a presumed malice against mankind, or from a drunken state that suggests no motive at all, but this certainly is the limit of its reasonable application. Where a man though drunk hunts down and kills, not at random, but his enemy, drunkenness explains nothing not perfectly comprehensible under the ordinary laws of human conduct. The very fact of selection destroys utterly any reasonable deduction of a want of motive or of any motive but malice, and the selection is explained beyond a reasonable doubt by the normal state of mind, not in any sense dependent upon or affected by intoxication; there is left no possible place for any consideration or speculation as to the effect upon the mind of the intoxicant. It did not cause or deter or alter the pre-existent motive; its only possible effect, if any, was upon the nerve or the prudence, and being voluntarily assumed is no excuse for a superabundance of nerve or the lack of prudence. It

therefore follows necessarily it can only have weight where there is no other explanation of an act otherwise incomprehensible to human understanding in the light of human experience. Consequently it is the established rule in this state and elsewhere that where one with a proven premeditated determination arms himself and takes intoxicants as a part of his preparation for homicide, his drunkenness is of no weight to explain away the malice.''

A similar contention was made in the case of Marshall v. Commonwealth, 141 Ky. 222, and the court in rejecting that contention said:

''The defendant determined in his heart to murder the woman. He then sent to learn if her husband was away from home, so as to be sure the coast was clear. He then went and got his razor, telling the purpose for which he got it, and to nerve himself for his desperate deed, drank the whiskey referred to, before going to the house of the defenseless woman and cutting her throat in bed. The man who determines to commit a crime, and then to nerve himself fills himself with whiskey is none the less guilty because he makes himself drunk in order to commit the crime.''

There are two reasons in this case why the instruction was properly refused. The first is that while there was some evidence defendant might have been to some extent under the influence of intoxicants at the time of the killing, there was no evidence of such an extreme state of intoxication as would have deprived him of the mental power and force to have the malice which was an essential element of the crime, and particularly in the light of the evidence that he had such preconceived malice and determination to commit the crime some time prior thereto. Second, because every fact and circumstance in evidence showed that he had a predetermination to kill Oelke, and calmly and deliberately went about his preparation to that end.

There are various degrees of intoxication, but that degree of intoxication which the law recognizes as a defense for crime is such intoxication as deprives the party of his mental power and reason to such extent as that he is incapable of having the malice which is an essential part of the crime. The evidence in this case shows that for some hours before the killing defendant deliberately made his preparations to that end. He sent his son to Oelke's

home to ascertain whether he was there, and receiving the information he was not he goes there and while there threatens to kill Oelke. After leaving there he returns to his home, puts his pistol in his pocket, takes the rifle and puts it into the machine, goes to the store or sends his son to purchase cartridges for the rifle, he understands fully the route which the man will take and the hour which he will probably come. He places himself in concealment at a convenient spot, taking the rifle out of the machine. He directs his son to drive the machine down the road and report to him when he sees Oelke coming, and when that report is made he directs his son to drive the machine a short distance up the road and wait for him, and then when his unsuspecting victim comes along the highway near him he fires upon and kills him. Are not all these things wholly and utterly inconsistent with the theory that he was intoxicated to such an extent as to be incapable of entertaining malice?

Not only so, there was ample evidence showing a predetermination to commit this crime many hours before its commission, and the two cases cited are very explicit in holding that one who gets drunk voluntarily in order to nerve himself to the commission of a crime, which he has theretofore determined to do, may not rely upon his drunkenness as a defense.

In the light of the ruling of the two cases quoted from, and in the cases of Graham v. Commonwealth, 200 Ky. 161, and Blackburn v. Commonwealth, 200 Ky. 638, we are of the opinion the lower court properly denied any additional instructions.

In the argument of the case by the county attorney, he used this language:

"In this case the finding of insanity means an acquittal. A finding of insanity does not mean that he will go to Central Asylum. It means that as soon as that verdict shall be read, 'We, the jury, find the defendant not guilty on the ground of insanity,' he stands up and is as free a man, so far as moral responsibility is concerned, as any one of you men."

It is urged for appellant that the trial court erred in overruling an objection to this statement, and that such action was prejudicial error.

We are not impressed with the contention. When analyzed the words only state an obvious fact, and that is so far as moral responsibility goes a verdict of in-

sanity by the jury would have resulted in freeing the defendant from this charge, but it does not mean that if he was found to be insane it would not be the duty of the court, or of the authorities, to have him so adjudged and properly incarcerated in a state institution.

The final contention is that appellant should be granted a new trial because during the progress of his trial in the lower court, and after the jury was sworn to try the case, and when the jury was in the custody of the sheriff, they were permitted to and did attend a moving picture show in Louisville, and that in going to and from the theatre the jury came in contact with thousands of people on the streets of Louisville, and that the theatre to which they went is a large one and crowded with people every night, and was on the night in question. These facts are disclosed in almost the language used above in an affidavit by defendant's counsel. There is no claim or assertion of any kind or description the jury was not at all times kept together, or that there was any communication between them and outsiders, or that any one of them was guilty of any improper conduct, or had the opportunity to be. Nor is it claimed or asserted in the affidavit that at the picture show on the occasion in question the picture given that night had anything to do with a murder trial, or depicted anything that could possibly have had any effect upon the minds of the jury.

In other words, the only contention is that the mere fact the jury in charge of the sheriff or his deputy attended a picture show is sufficient ground upon which to grant a new trial. The precise question has been twice passed upon by this court, and in two cases where there was at least greater ground to sustain it than is shown here.

Considering the importance of the case we might ordinarily go into this question in detail again except for the fact that this court has very recently conclusively passed upon the self-same question. Mansfield v. Commonwealth, 163 Ky. 488; Stamp v. Commonwealth, 200 Ky. 135.

We perceive no lawful reason why the judgment in question should be reversed.

Judgment affirmed. Whole court sitting.