## Marshall v. Commonwealth.

(Decided December 9, 1910.)

### Appeal from Shelby Circuit Court.

Homicide—Indictment and Conviction for Murder—Killing Defenseless Woman—Premeditated.—Where a defendant was indicted and convicted of murder, and his punishment fixed at death, the evidence showing that he had determined in his heart to kill his victim, and sent to learn if her husband was away from home so as to be sure the coast was clear, and then got his razor, telling the purpose for which he got it, and to nerve himself got drunk before going to the house of a defenseless woman and cut her throat in bed, we do not see that an instruction on voluntary manslaughter had any place in the case.

J. C. BECKHAM & SON, E. B. BEARD and W. T. BECKHAM for appellant.

JAMES BREATHITT, Attorney General, and TOM B. McGREGOR, Asst. Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HOBSON—Affirming.

Appellant was indicted for the murder of Lizzie Harrington, and being found guilty, and his punishment fixed at death, he appeals.

Practically the only ground relied on for a reversal is that the court failed to give an instruction on the law of voluntary manslaughter. The settlement of this question requires a statement of the substance of the testimony. The deceased, Lizzie Harrington, had lived in Louisville for several years with the witness, Sandy Harrington; she was not married but had two children by him. About two months before the killing she left Harrington and Louisville and went to Shelbyville, the home of appellant, where she met and lived with appellant in a small house in a suburb of that city until the day before the killing, when Sandy Harrington arrived in Shelbyville and he and Lizzie were married and went to another house in the city and spent the night. Appellant worked at Harbinson & Well's livery stable. Early Sunday morning, after Lizzie had married Sandy Harrington on the evening before, appellant went to the stable and in company with several other hands began and finished his duty of cleaning horses and the other work around the stable. Several of the boys who were working with him testified that while doing his work he stated that "he had a little bad luck," and upon being asked what it was, he answered that "his girl had married on him and that he was going down and cut her head off." One of the witnesses told him he had better "cut out that foolishness" and he replied that "he was looking for death and nothing but death would satisfy him." By this time he had completed his duties and started away. One or two of the witnesses invited him to go with them to breakfast, but he declined and some one told him he had better take his coat, and he replied "he didn't need a coat, as he was going to meet death." The Commonwealth further proved that appellant went early that morning and obtained his razor from a friend who had borrowed it. Before leaving the stable, he gave a boy ten cents to go to another livery stable at which Sandy Harrington was working to see whether he was there, which the boy did and reported that he was. The Commonwealth showed by another witness, who was in the house opposite the house occupied by Sandy Harrington and the deceased, that at about seven or seven thirty o'clock a. m. he saw appellant go into the Harrington house; that he remained there three or four minutes,

came running out and went away; that while he was in the house some one screamed; that appellant had his sleeves rolled up, but nothing was seen in his hands. When Harrington returned to the house from his work he found his wife dead. Sandy Harrington, a policeman and the physician testified that deceased's throat was cut from ear to ear; that the arteries and windpipe were severed; that there was blood over the room and bed and that a part of a razor blade was found on the bed. Deceased was found lying mostly in an adjoining room with her head in the door between the rooms.

Appellant did not testify but introduced his father, mother and other witnesses who had known him from childhood. The substance of their testimony was to the effect that appellant was one of twins; that the other had died early in life without ever having been possessed of any intelligence; that appellant had at different times shown by his acts and conduct that he was not right in his mind; that he was weak minded; that his father, who was then about eighty years old, had been adjudged a lunatic and sent to the asylum twice. It was also shown by the Commonwealth witnesses who were with appellant at the stable that morning before breakfast, that appellant had whisky. One witness saw him take a drink, another one drink and another saw him take four drinks. One or two of them said that he appeared to be drunk. One or two said they did not know whether he was drunk or not, but that he appeared to be whining or crying. The defendant before leaving the stable showed the razor to one of the men there telling him he was going to cut the woman's head off with it. Declaring he was going to meet death, he went from the stable to the house where she was, and the signs there indicated that he found her in bed, and cut her throat in bed, and she had then struggled from the bed to the point where her body was found a few feet away from it. He stated to persons he met before his arrest that he had killed her, and he did not testify on the trial.

The court instructed the jury under the facts proved, upon the law of murder and insanity, but did not give an instruction upon voluntary manslaughter, and for this reason appellant asks a reversal.

The court has in a number of cases held that the evidence that the defendant was drunk at the time of the homicide is competent to be considered by the jury upon the question whether the killing was with malice afore-

thought. It is insisted that under the rule laid down in Nichols v. Commonwealth, 11 Bush, 575; Rogers v. Commonwealth, 96 Ky., 24, and Bishop v. Commonwealth, 109 Ky., 558, an instruction on voluntary manslaughter should have been given as there was some evidence on behalf of the defendant to the effect that he was drunk, although there was other evidence to the effect that he was excited rather than drunk. But we do not think 'this is a case to which the rule referred to should be applied. The sum of the evidence is this: The defendant determined in his heart to murder the woman. He then sent to learn if her husband was away from home, so as to be sure the coast was clear. He then went and got his razor, telling the purpose for which he got it, and to nerve himself for his desperate deed, drank the whisky referred to, before going to the house of the defenseless woman and cutting her throat in bed. The man who determines to commit a crime, and then to nerve himself fills himself with whisky is none the less guilty because he makes himself drunk in order to commit the crime. There is no evidence that the defendant was drunk or drinking when he formed his design to kill the woman and set about his preparations for the deed. On the evidence we do not see that an instruction on voluntary manslaughter had any place in the case.

There was proof of unsoundness of mind by him, and this matter was properly submitted to the jury by the court. On the whole record we do not see that any substantial right of the defendant was prejudicated on the trial.

Judgment affirmed.