Samuel Steven FIELDS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1997–SC–0424–MR.

Supreme Court of Kentucky.

Feb. 24, 2000.

Oleh R. Tustaniwsky, Thomas M. Ransdell, Assistant Public Advocates, Department of Public Advocacy, Frankfort, for appellant.

A.B. Chandler, III, Attorney General, Frankfort, David A. Smith, Kent T. Young, Dana M. Todd, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, for appellee.

COOPER, Justice.

During the early morning hours of August 19, 1993, Bess Horton was murdered in the bedroom of her home in Grayson, Kentucky. Her throat was slashed, and she was stabbed in the head with such force that the knife buried to the hilt in her right temple and the point of the blade protruded from her left temple. Officers Ron Lindeman and Larry Green of the Grayson Police Department were in the neighborhood investigating a suspected burglary when they saw a light in the Horton residence. Lindeman entered Mrs. Horton's bedroom through an open window and discovered her body lying in her bed. He also encountered Appellant Samuel Fields in the bedroom in possession of a knife, two razor blades, and numerous items of Mrs. Horton's jewelry. Following a trial by jury in the Rowan Circuit Court, Appellant was convicted of Horton's murder and sentenced to death. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). We reverse for a new trial, because (1) the jury was permitted to hear the recorded narrative of a staged videotaped reenactment of Lindeman's investigation of the crime scene, and (2) the trial judge erroneously failed to instruct the jury on manslaughter in the second degree as a lesser included offense of murder.

## I. FACTS.

Appellant's girlfriend, Minnie Burton, acted as a chauffeur for Mrs. Horton and ran errands for her when requested. In exchange, Horton allowed Burton to live rent-free in a duplex apartment located near Horton's residence. There was evidence that Horton decided to evict Burton and that she cut off the water to Burton's apartment, forcing her to spend nights at the homes of friends. There was also evidence that Burton had remarked that "someone ought to kill (Horton)," and that

she had told a friend, Phyllis Berry, that Horton kept a metal box containing $4,000.00 in her bedroom. This latter information became significant when another witness testified that Berry had confessed to him that she and Minnie Burton went to Horton's residence to steal the metal box and that she (Berry) killed Horton when Horton awoke during the burglary and recognized Burton.

From about noon on August 18, 1993 until after midnight, Appellant, Minnie Burton, Phyllis Berry, and others drove around Carter and Boyd Counties, consuming large amounts of alcohol, mostly beer. The group made two separate trips to Ashland to purchase several cases of beer. They stopped at the residence of Phyllis Berry's brother in Boyd County, where Appellant drank some whiskey and ingested some "horse tranquilizers." Appellant and Burton finally returned to Grayson with the intention of spending the night at a residence occupied by Appellant's mother and brother. After entering the residence, Appellant continued drinking beer and began quarreling with Burton. When he began throwing food, furniture and other objects, including knives, around the kitchen, Burton fled the residence and told Appellant she was going to her apartment. After destroying some more personal property and threatening his brother with a knife, Appellant broke the glass on the kitchen door with his fist, causing lacerations of his right arm. After retrieving several more cans of beer, Appellant proceeded to Burton's apartment.

Burton had been unable to gain entry to her apartment, because Elmer Prichard, the other resident of the duplex, had locked the doors. Appellant arrived and told Burton that he had killed his brother (which he had not), and asked her if she would dispose of the alleged murder weapon. He gave Burton a knife, which she threw into some nearby bushes. Appellant then went into "a frenzy" and attempted to gain entry to Burton's apartment by ripping the screens off of the windows. Burton again fled. Elmer Prichard called the police and Officers Lindeman and Green responded to the call. Appellant testified that he then proceeded to the Horton residence looking for Burton, because Burton had told him of her intention to "rob" Horton. He sat on Horton's porch for a while drinking beer, then entered Horton's bedroom through an open window. He turned on his cigarette lighter for illumination and saw that the room had been ransacked. However, he did not notice Horton's body on the bed. He then began pocketing whatever he could find, including jewelry and a knife.

While investigating the attempted burglary of the duplex, Officers Lindeman and Green noticed a light inside the Horton residence. They found the garage door open, but the inside door locked. Lindeman then discovered the open window and climbed inside, where he found both Horton's body and Appellant. Some jewelry, a knife, and two razor blades either fell from or were removed from Appellant's pockets. According to Lindeman, he offered to read Appellant his *Miranda* rights, but Appellant was able to recite them verbatim. Appellant then stated: "Kill me, Ron. Kill me. I stabbed her and I'm into it big this time." Lindeman testified that when he asked Appellant why he had killed Horton, Appellant replied: "I don't know. Kill me Ron. I'm going to prison for the rest of my life this time." Appellant denied uttering these statements. His version was that Lindeman jumped on him and knocked him to the floor, then put a gun to his head, accused him of killing Horton, and threatened to shoot him.

Appellant was arrested and transported by Kentucky State Trooper Roy Wolfe to King's Daughters' Medical Center in Ashland for treatment of injuries to his right arm. Wolfe testified that in his opinion, Appellant was intoxicated.

After Appellant was removed from the crime scene, Officer Lindeman and an unidentified cameraman staged a lengthy and dramatic videotaped reenactment of the

investigation leading up to Appellant's arrest and alleged confession. The cameraman filmed Lindeman as he retraced his route from the duplex apartment to the Horton residence, to the open garage door, then through the open window and into the bedroom. As he led the cameraman through the reenactment, Lindeman narrated where he was, what he was doing, and why. He also described Officer Green's locations and activities. After entering the bedroom during the reenactment, Lindeman used his flashlight to demonstrate how he drew his gun on Appellant. He narrated how the jewelry, the knife, and the razor blades had either fallen or been removed from Appellant's pockets, and repeated verbatim Appellant's confession to murdering Mrs. Horton. The camera was then panned around the bedroom to the jewelry, the knife, and the razor blades, then to some blood on the carpet which Lindeman described as Appellant's blood. Finally, the camera was focused on the bed where Mrs. Horton's body still lay, her throat slashed and the knife still buried in her right temple. The camera continued to focus on Mrs. Horton's wounds for approximately forty seconds until the video was concluded.

Appellant was treated in the emergency room at King's Daughters' Medical Center for some minor lacerations of his right arm. No stitches were required. Appellant was examined by Jason Dobson, an emergency medical technician (EMT), who opined at trial that there was too much blood on Appellant's arms and clothing to have been caused by such minor injuries. Dobson also testified that he asked Appellant how he got the blood on him and that Appellant responded: "You stupid s.o.b., if you had just killed some lady, you would be covered with blood, too." The blood on Appellant's arm was washed off at the hospital. Subsequent blood typing and DNA testing revealed that none of the blood found on Appellant's clothing was traceable to Mrs. Horton and none of the blood found on Horton's bed was traceable to Appellant.

## II. VIDEOTAPED EVIDENCE.

Appellant moved *in limine* to suppress the videotaped reenactment of Lindeman's investigation, or, in the alternative, to suppress the audio narrative portion thereof, especially Lindeman's repetition of Appellant's alleged confession. The motion was overruled and the videotape was played to the jury in its entirety, both video and audio, not only during Lindeman's direct testimony, but also during both the prosecutor's opening statement and his closing argument.

■ A videotape of a crime scene, including the position of the victim's body and the location and nature of the victim's injuries, is just as admissible as a photograph, assuming a proper foundation is laid. *Bedell v. Commonwealth*, Ky., 870 S.W.2d 779 (1993); *Milburn v. Commonwealth*, Ky., 788 S.W.2d 253 (1989). If relevant and probative of an issue in the case, a videotape of a crime scene, like a crime scene photograph, is admissible even though gruesome. *Mills v. Commonwealth*, Ky., 996 S.W.2d 473, 489 (1999); *see also Dillard v. Commonwealth*, Ky., 995 S.W.2d 366, 370 (1999) and cases cited therein. While we have some reservations with respect to the propriety of focusing the camera on the victim's wounds for as long as forty seconds, we conclude that jurors would be no more inflamed by this lengthy depiction than by being exposed to a crime scene photograph for the same duration of time. Thus, we conclude that there was no error in admitting the video portion of the taped reenactment. The admission of the audio portion, however, significantly implicates the hearsay rule.

■ The audio narration on the videotape was undoubtedly an out-of-court statement offered to prove the truth of the matter asserted, *i.e.*, hearsay. KRE 801(c). The narration did not fall within any exception to the hearsay rule. It was not a present sense impression, KRE 803(1), because it did not describe events

as they were happening, but events which had already occurred. It was not within the recorded recollection exception, KRE 803(5), because Lindeman did not claim to have insufficient recollection of the facts as to be unable to testify without reference to the videotape. In fact, he had already testified to the exact same facts which were repeated in the recorded narration. Appellant's brief characterizes the audio portion of the videotape as a "verbal police report," which is inadmissible under the public records exception, KRE 803(8)(A). No effort was made to qualify the videotape as a business record. KRE 803(6); *Prater v. Cabinet for Human Resources,* Ky., 954 S.W.2d 954, 957–59 (1997). The maker of the record, *i.e.,* the cameraman, was never identified, and there was no proof that it was the regular practice of the Grayson Police Department to videotape reenactments of criminal investigations. *Rabovsky v. Commonwealth,* Ky., 973 S.W.2d 6, 10 (1998).

■ The audio narration on the videotape was, in fact, a prior consistent statement offered to bolster Lindeman's in-court testimony. KRE 801A(a)(2). A prior consistent statement generally is admissible only to rebut an express or implied charge of recent fabrication or improper influence or motive, *id.,* neither of which is present in this case. In fact, the videotape was not offered as rebuttal, but was first played during the prosecutor's opening statement, which occurred not only prior to the introduction of any evidence, but prior to defense counsel's opening statement. Professor Lawson enumerates some other circumstances when a prior consistent statement could possess "probative value beyond mere repetition," *i.e.,* to cast doubt on whether or not an alleged prior inconsistent statement was uttered, to refute a claim of inaccurate recollection by the witness who made the prior statement, to amplify or clarify an alleged prior inconsistent statement, or to reflect upon the seriousness of alleged inconsistencies between testimony and a prior inconsistent

statement. R. Lawson, *The Kentucky Evidence Law Handbook* § 8.10 II, at 379–80 (3d ed. Michie 1993). None of those circumstances exist in this case.

In overruling the motion to suppress the audio portion of the videotape, the trial judge relied on language from our opinion in *Milburn v. Commonwealth, supra:*

[Appellant] particularly objects to a portion of the tape which focused on a large pool of blood, and the simultaneous commentary of the investigating police officer.

This videotape evidence does not fall outside of the broad category of photographs which we have found admissible under a liberal approach recognized in *Gall v. Commonwealth,* Ky., 607 S.W.2d 97, 106 (1980), and continued through *Wager v. Commonwealth,* Ky., 751 S.W.2d 28, 31 (1988). The narrative supplied in no way measures up to a grotesque "Poe-like description" as appellant has so characterized it. We uphold the competent ruling of the trial court to admit probative evidence.

*Id.* at 257.

The trial judge interpreted the first quoted sentence to mean that the "simultaneous commentary of the investigating police officer" was an audio recording accompanying the videotape. The Commonwealth concedes that, in fact, the videotape in *Milburn* was played with the audio portion muted and that the "simultaneous commentary" was provided by the investigating officer from the witness stand describing the contents of the videotape as it was being played. *Milburn* provides no authority for allowing a jury to hear an unsworn out-of-court narration of videotaped evidence.

The Commonwealth does not assert that the pre-recorded narration of the videotape falls within an exception to the hearsay rule, but relies solely on the cases of *Lee v. State,* 526 N.E.2d 963 (Ind.1988), *overruled on other grounds, Rita v. State,* 674 N.E.2d 968 (Ind.1996) and *State v.*

*Van Tran*, 864 S.W.2d 465 (Tenn.1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994) in both of which the admission of similar evidence was held not to be reversible error. That reliance is misplaced.

In *Lee v. State, supra*, the Indiana Supreme Court noted that, "Officer Trennerry's narration in no way connected appellant with the case nor did he draw any conclusions concerning appellant. His narration was purely factual as to what was being depicted on the tape at the time." 526 N.E.2d at 965. Here, the audio portion of the videotape included not only a description of what was being depicted on the tape, but also Lindeman's repetition of Appellant's alleged confession to the murder. In *State v. Van Tran, supra*, the Tennessee Supreme Court in fact found that it was error to permit the jury to hear the audio portion of a videotape which described a crime scene as it was being filmed. "The better practice would have been for the trial court to have turned off the volume and had Officer Garner narrate the tape from the witness stand." 864 S.W.2d at 477. However, the error was deemed harmless, because the narrative pertained mainly to minor matters or facts established elsewhere in the record, and because of the clear evidence of the defendant's guilt. Here, the narrative included a repetition of Appellant's alleged confession, and the evidence of Appellant's guilt of murder was not overwhelming, given the results of the blood tests and Phyllis Berry's alleged admission that she was the person who killed Mrs. Horton.

In *Scott v. State*, 559 So.2d 269 (Fla.Dist. Ct.App.1990), the execution of a search warrant by police was videotaped by a national television film crew. The videotape, including the audio portion, was played to the jury during the defendant's subsequent criminal trial for trafficking in a controlled substance. The audio portion included statements by police officers that a number of complaints had been filed against the residents of the searched premises, that cocaine trafficking had occurred on the premises, and that the property was not zoned for a "supermarket for cocaine." Admission of the audio portion was held reversible error because the unsworn statements of the officers were inadmissible hearsay. In *Scott*, the inadmissible hearsay occurred in a recording of events as they were occurring. Here, the inadmissible hearsay occurred in a recording of a reenactment of events which had already occurred. Either way, the legal principle is the same.

■ Compounding the error in this case is the fact that the videotape was played to the jury in its entirety not only during the Commonwealth's case-in-chief, but also during both the prosecutor's opening statement and his closing argument. RCr 9.42(a) states that, "[t]he attorney for the Commonwealth shall state to the jury the nature of the charge and the evidence upon which the Commonwealth relies to support it." Thus:

> The only legitimate purpose of an opening statement is so to explain to the jury the issue they are to try that they may understand the bearing of the evidence to be introduced.

*Lickliter v. Commonwealth*, 249 Ky. 95, 60 S.W.2d 355, 357 (1933); *see also Brummitt v. Commonwealth*, Ky., 357 S.W.2d 37 (1962); *Turner v. Commonwealth*, Ky., 240 S.W.2d 80 (1951); *Mills v. Commonwealth*, 310 Ky. 240, 220 S.W.2d 376 (1949).

While we have allowed prosecutors to display admissible items of real evidence to the jury during opening statement, *Sherley v. Commonwealth*, Ky., 889 S.W.2d 794 (1994) (photograph of the victim), *Shelton v. Commonwealth*, 280 Ky. 733, 134 S.W.2d 653 (1939) (bloody coat worn by the defendant), we have never sanctioned the playing of a witness's prerecorded *testimony* during opening statement, much less a witness's prerecorded unsworn statement. As for closing argument, attorneys are generally allowed to replay excerpts from recorded testimony, which is analogous to

reading excerpts from the record. *Hodges v. State,* 194 Ga.App. 837, 392 S.E.2d 262 (1990); *People v. Gross,* 265 Ill.App.3d 74, 202 Ill.Dec. 250, 637 N.E.2d 789 (1994). Here, however, the replay of the videotape was but a repetition of Lindeman's entire testimony, tantamount to recalling Lindeman to the witness stand in the middle of summation. Compare *Egan v. Dotson,* 36 S.D. 459, 155 N.W. 783 (1915), *overruled on other grounds, Hackworth v. Larson,* 83 S.D. 674, 165 N.W.2d 705 (1969), in which a *pro se* litigant attempted to give unsworn testimony regarding a disputed fact during his opening statement.

The right of a person to try his own case does not contemplate the privilege of giving testimony three times in the same case, viz: As an unsworn witness in the "opening statement;" as a witness under oath; and again in his closing argument.

*Id.* at 790.

■ Officer Lindeman actually testified *four* times with respect to his investigation and Appellant's alleged confession in this case, *viz:* As an unsworn witness during opening statement, both sworn and unsworn during the Commonwealth's case-in-chief, then again as an unsworn witness during closing argument. We do not decide here whether the repetition of *admissible* evidence could so prejudice a defendant as to entitle him to a new trial. We do decide here that the repetition of *inadmissible* evidence regarding a disputed fact was so prejudicial in this case as to preclude any finding of harmless error.

## III. INTOXICATION DEFENSE.

There was evidence that during the hours preceding Bess Horton's murder, Appellant consumed a substantial quantity of beer, whiskey, "horse tranquilizers," and possibly marijuana. His drunken, out-of-control behavior after arriving at his mother's residence on the night of the murder was well documented. Minnie Burton testified that the two began quarreling because Appellant was attempting to cook "crazy stuff, like pickles, stuff you really don't cook," in a frying pan; and that Appellant told her that, "I don't have any control over anything I do." Phyllis Berry described Appellant as "highly intoxicated." Appellant's brother testified that Appellant was "wired up and ready to fight." Officer Wolfe described Appellant as being intoxicated when he transported him from the crime scene to King's Daughters' Medical Center. From this evidence, the trial judge could and did conclude that Appellant was entitled to an instruction on the defense of intoxication. *Slaven v. Commonwealth,* Ky., 962 S.W.2d 845, 856 (1997); *Brown v. Commonwealth,* Ky., 575 S.W.2d 451, 452 (1978); *Jewell v. Commonwealth,* Ky., 549 S.W.2d 807, 814 (1977), *overruled on other grounds, Payne v. Commonwealth,* Ky., 623 S.W.2d 867 (1981), *cert. denied,* 456 U.S. 909, 102 S.Ct. 1758, 72 L.Ed.2d 167 (1982). However, he refused Appellant's request to instruct the jury on second-degree manslaughter as a lesser included offense of murder.

■ As pointed out in *Slaven v. Commonwealth, supra,* at 857, the defense of voluntary intoxication does not authorize an acquittal if the jury finds the defendant was so intoxicated that he could not form the requisite intent to commit murder. Rather, its effect is to reduce the offense from the intentional crime of murder (or first-degree manslaughter) to the wanton crime of second-degree manslaughter. The definition of "wantonly" provides that a person who acts wantonly "solely by reason of voluntary intoxication also acts wantonly with respect thereto." KRS 501.020(3). This means that if a defendant was so voluntarily intoxicated that he killed another without the intent to do so, the fact of his voluntary intoxication, itself, constituted the element of wantonness necessary to convict of second-degree manslaughter. Thus, if a jury is instructed on voluntary intoxication as a defense to intentional murder or first-degree manslaughter, it must also be instructed on second-degree manslaughter as a lesser included offense; and the failure to do so

is prejudicial error. *Springer v. Commonwealth*, Ky., 998 S.W.2d 439, 454–55 (1999); *Slaven v. Commonwealth, supra,* at 856–57. Having determined that Appellant was entitled to an instruction on the defense of voluntary intoxication, the trial judge's refusal to instruct on second-degree manslaughter was reversible error requiring a new trial.

## IV. DOBSON'S OPINION TESTIMONY.

■■■ Appellant asserts it was error to permit the EMT, Dobson, to express an opinion that there was too much blood on Appellant's arms and clothing to have resulted solely from Appellant's relatively minor injuries. The trial judge found that Dobson had sufficient training and experience to express such an opinion, KRE 104(a), KRE 702, and we conclude that his finding in that regard was not an abuse of discretion. *Fugate v. Commonwealth*, Ky., 993 S.W.2d 931 (1999); *Ford v. Commonwealth*, Ky., 665 S.W.2d 304 (1983), *cert. denied,* 469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325 (1984).

## V. APPELLANT'S STATEMENT TO DOBSON.

■■■ Appellant asserts it was error to permit Dobson to repeat the incriminating response which Appellant made to Dobson's inquiry about the origin of the blood on his body and clothing, because Appellant had not been readvised of his *Miranda* rights before the inquiry was made. We note at the outset that *Miranda* was concerned with "the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation." *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). *Miranda* does not require that the warnings be repeated each time the interrogation process is resumed after an interruption. *United States v. Delay*, 500 F.2d 1360, 1365 (8th Cir.1974); *Evans v. Swenson*, 455 F.2d 291, 296–97 (8th Cir.1972),

*cert. denied,* 408 U.S. 929, 92 S.Ct. 2508, 33 L.Ed.2d 342 (1972); *Miller v. United States*, 396 F.2d 492, 496 (8th Cir.1968), *cert. denied,* 393 U.S. 1031, 89 S.Ct. 643, 21 L.Ed.2d 574 (1969). "In each case, the ultimate question is: Did the defendant, with a full knowledge of his legal rights, knowingly and intentionally relinquish them?" *Miller v. United States, supra,* at 496. At the time of his arrest, Appellant told Officer Lindeman that he was aware of his *Miranda* rights and, in fact, recited them verbatim to Lindeman. He does not claim and there is no reason to assume that he suddenly forgot them while being transported from the crime scene to the hospital.

Furthermore, Dobson was not a police officer, but an employee of the hospital. There was no evidence to support a conclusion that he was a state actor as is required to support a claim of a violation of a constitutional right.

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); *see also Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *Commonwealth v. Cooper*, Ky., 899 S.W.2d 75, 76–77 (1995), *cf. Coolidge v. New Hampshire*, 403 U.S. 443, 487–90, 91 S.Ct. 2022, 2048–50, 29 L.Ed.2d 564 (1971); *Brock v. Commonwealth*, Ky., 947 S.W.2d 24, 29 (1997).

Appellant relies on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in which incriminating statements made by a defendant to a psychiatrist during a competency examination were held inadmissible against him, because the statements were elicited absent preliminary *Miranda* warnings. The psychiatrist was deemed a state actor, because he had been appointed by the court to conduct the examination. Here, there was no evidence that EMT Dobson was requested or ap-

pointed by any state agency to interrogate Appellant about the origin of the blood on his body and clothing. The mere fact that the police transported Appellant to King's Daughters' Hospital for treatment of his wounds did not, *ipso facto*, transform Dobson from a hospital employee into a state actor.

## VI. EXCLUSION OF EXCULPATORY EVIDENCE.

 An arguably exculpatory investigative report was discovered in the records of the Grayson Police Department and furnished to defense counsel prior to trial. The report was unsigned and consisted primarily of hearsay information obtained by its unidentified author from witnesses who implicated Minnie · Burton, Phyllis Berry and Berry's boyfriend, Scott Trent, in the murder of Mrs. Horton. The report concluded:

> I, myself, believe after talking with these people and listening to their stories, that the burglary and murder took place earlier that evening and that the other people had ran off and left Sammy because he had gotten to (sic) wild for them and that Sammy had returned to Minnie Burton's apartment and broke in there looking for her. Not finding her there, he returned to the crime scene of Mrs. Horton's home.

Officer Lindeman speculated that the report had been authored by Appellant's father, Ronald Fields, a former employee of the Grayson Police Department who was employed by the Olive Hill Police Department on the date of Mrs. Horton's murder. Ronald Fields admitted that he had conducted his own investigation and prepared a report which he furnished to the Grayson Police Department, though he was never called upon to identify this particular report. The report consisted almost exclusively of the kind of "investigative hearsay" which we have consistently condemned. *Slaven v. Commonwealth, supra*, at 859; *Bussey v. Commonwealth*, Ky., 797 S.W.2d 483, 486 (1990); *Sanborn*

*v. Commonwealth*, Ky., 754 S.W.2d 534, 541 (1988), *cert. denied*, 516 U.S. 854, 116 S.Ct. 154, ·133 L.Ed.2d 98 (1995). This kind of evidence is no more admissible when offered by the defendant than when offered by the Commonwealth. Nor does the report fall within the business records exception to the hearsay rule, since there was no proof that the person who prepared the report was under a business duty to do so. KRE 803(6); *Rabovsky v. Commonwealth, supra*, at 10; *Prater v. Cabinet for Human Resources, supra*, at 959; Lawson, *supra*, § 8.65 V, at 465–66. If it was, indeed, prepared by Ronald Fields, he did so at a time when he was not an employee of the Grayson Police Department. Finally, the author's opinion would not have been admissible under this exception. KRE 803(6)(B).

## VII. MISCELLANEOUS ISSUES.

 Appellant cites several instances in which he believes the Commonwealth introduced evidence of "other bad acts" in violation of KRE.404(b). We have examined each of these claims and disagree with Appellant's characterization of this evidence. Specifically, the fact that Officer Lindeman knew Appellant did not imply prior bad conduct, since Appellant's father was a police officer and had formerly worked for the Grayson Police Department. The fact that Minnie Burton was afraid of Appellant logically followed the facts that Appellant had thrown knives at her while at his mother's residence and had told her that he had just killed his brother. The fact that Phyllis Berry testified that her brother was now in prison cast no reflection on Appellant's character just because Berry's brother was an acquaintance of Appellant.

The crime scene photographs were admissible for the same reasons as the video portion of the crime scene videotape. The prosecutor's inquiry of Officer Lindeman as to whether Appellant denied killing Mrs. Horton was not a comment on Appellant's silence. According to Lindeman,

Appellant did not exercise his right to remain silent, but admitted killing Mrs. Horton. The trial judge did not abuse his discretion or deny Appellant a public trial by removing spectators from the courtroom prior to hearing legal arguments concerning jury instructions, particularly in the absence of any objection. *See generally Lexington Herald–Leader Co., Inc. v. Meigs,* Ky., 660 S.W.2d 658 (1983). Except for the failure to include an instruction on second-degree manslaughter, the trial judge's instructions accurately framed the law of the case. It was not error to admit evidence of Appellant's five prior convictions during the penalty phase of the trial. KRS 532.025(1)(b). Use of the burglary as an aggravating factor authorizing imposition of the death penalty did not constitute double jeopardy. *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293, 308 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997).

Since this case is being remanded for a new trial, there is no need to discuss the claimed errors relating to jury selection, Appellant's temporary absence from the courtroom during voir dire, or other matters which are unlikely to recur upon retrial.

Accordingly, the judgment of conviction and sentence imposed in this case are reversed and this case is remanded to the Rowan Circuit Court for a new trial in accordance with the contents of this opinion.

LAMBERT, C.J.; JOHNSTONE, and STUMBO, JJ., concur.

KELLER, J., dissents by separate opinion, with GRAVES and WINTERSHEIMER, JJ., joining that dissent.

KELLER, Justice, dissenting.

I dissent from the majority opinion because I disagree with the conclusions it reaches regarding both the videotaped evidence, Part II, and the intoxication defense, Part III. In my opinion, neither assignment of error justifies our reversal of Fields' conviction.

## NARRATED VIDEOTAPE EVIDENCE

While I agree with the majority's conclusion that the narrated portion of the videotape was inadmissible hearsay, I cannot agree that the improper admission of this evidence was sufficiently prejudicial under RCr 9.24 to warrant reversal of the conviction. Much of the material contained in the video demonstration concerns the locations and movements of the investigating officers while on the scene, and these were not only uncontested issues, but also minor matters of the type found harmless in *State v. Van Tran,* 864 S.W.2d 465 (Tenn. 1993). Fields contests factually only the segment of the video demonstration where Officer Lindeman describes the encounter between himself and Fields and where he recites Fields' alleged confession. Fields testified that Officer Lindeman jumped on him, knocked him on the floor, put a gun to his head, threatened to shoot him, and accused him of killing Bess Horton. This was contradicted by Officer Lindeman's testimony at trial. The majority opinion indicates that Fields denied telling Officer Lindeman that he had stabbed Bess Horton, but Fields admitted during his testimony that he may have made the statements in an effort to appease Officer Lindeman.

While I believe the majority is correct to describe the audio narration on the videotape as an inadmissable prior consistent statement offered to bolster Lindeman's in-court testimony, I do not feel that its introduction into evidence and the Commonwealth's presentations of the video to the jury "affected the substantial rights" of Fields. RCr 9.24.

Fields testified during the guilt/innocence phase of his trial, and, in addition to exposing himself to impeachment on the basis of his prior felony record, gave the jury an opportunity to hear his theory that his girlfriend had killed Bess Horton. Of-

ficer Lindeman testified at trial consistently with his narration on the videotape and Fields had an opportunity to cross-examine him on all of that testimony. The jury heard from an emergency room EMT, Jason Dobson, that Fields incriminated himself by explaining the large amount of blood on his arms and clothing with the statement, "You stupid s.o.b., if you had just killed some lady, you would be covered with blood, too." After deliberating on all of the evidence presented, the jury believed beyond a reasonable doubt that Fields murdered Bess Horton.

RCr 9.24 directs this Court to reverse a criminal conviction on the basis of evidentiary matters only when it appears to us that "the denial of such relief would be inconsistent with substantial justice." I cannot conclude that the jury was so divided over the issue of the relative credibility of Fields and Officer Lindeman that they were swayed by the number of times Officer Lindeman's version was presented to them. Both Fields and Officer Lindeman testified in court during the trial. This afforded the jury the opportunity to assess and weigh their relative credibility. I believe the trial court's admission of the narrated videotape was erroneous, but insufficiently prejudicial to justify reversal because I do not believe that if the audio portion of the videotape had been played fewer times, or not at all, that the jury would have reached any other conclusion.

## INTOXICATION DEFENSE & SECOND–DEGREE MANSLAUGHTER

In Part III of the majority opinion, the Court holds that the trial court committed reversible error by failing to instruct the jury on the lesser included offense of second-degree manslaughter. I disagree with this conclusion because the majority's holding represents a radical departure from precedent which holds that the trial court may only instruct on lesser included offenses when the evidence presented "justif[ies] a doubt based on the theory that

the crime committed was of a lower degree or lesser culpability." *Brown v. Commonwealth*, Ky., 555 S.W.2d 252, 257 (1977). As all of the evidence concerning Bess Horton's murder demonstrates an intentional murder devoid of any wanton component whatsoever, the majority holding creates a special rule that trial judges who instruct juries on the defense of voluntary intoxication must always also instruct on second-degree manslaughter as a "package deal." Because I can see no principled basis or statutory support for such a rule, I must dissent.

Lesser included offenses are not an entitlement, and this Court has consistently held that trial courts should instruct on lesser included offenses "only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 36–7 (1998) (*citing Webb v. Commonwealth*, Ky., 904 S.W.2d 226 (1995)); *See also, Brown v. Commonwealth, supra; Tipton v. Commonwealth*, Ky., 640 S.W.2d 818, 820 (1982) ("[T]o support a lesser included instruction the posture of the evidence must be such as to create a reasonable doubt as to whether the defendant is guilty of the higher or lower degree." *Id.*); *Moore v. Commonwealth*, Ky., 771 S.W.2d 34, 37 (1989) (*citing Hayes v. Commonwealth*, Ky., 625 S.W.2d 583 (1982)) ("It is not proper to instruct the jury on a wanton offense when all the evidence indicates that it would be unreasonable for the jury to believe that the defendant's conduct was anything other than intentional." *Id.*); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 108–109 (1980).

The United States Supreme Court, in *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) clarified that the decision as to whether to instruct a jury on lesser included offenses has a constitutional dimension: "due process re-

quires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Id* at 611, 102 S.Ct. 2049; *See Cox v. Commonwealth*, Ky., 491 S.W.2d 834 (1973).

KRS 501.020 defines the mental states applicable in the Kentucky Penal Code:

(1) "Intentionally"—A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause that result or to engage in that conduct.

. . .

(3) "Wantonly"—A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of involuntary intoxication also acts wantonly with respect thereto.

(4) "Recklessly"—A person acts recklessly with respect to a result or to a circumstance described by a statute de-

fining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

KRS 501.020.

It is important to realize that, unlike at common law,[1] the culpable mental states defined at KRS 501.020 are fully and clearly defined so as to be mutually exclusive. In *Wells v. Commonwealth*, Ky., 561 S.W.2d 85, 88 (1978), we described intent and wantonness manifesting extreme indifference to the value of human life as "two distinct culpable mental states." *Id.* " 'Culpable mental state' means 'intentionally' *or* 'knowingly' *or* 'wantonly' *or* 'recklessly,' as those terms are defined in KRS 501.020." KRS 501.010(1) (emphasis added). Although the draft Model Penal Code included a provision which defined less culpable mental states as fully encompassed within its definition of "purposely" (what the Kentucky Penal Code refers to as intentional conduct in an identical definition),[2] the General Assembly did not adopt this subsection, and defined the culpable mental states so that a given act is undertaken *either* intentionally *or* knowingly *or* wantonly *or* recklessly.[3] The trial court should only instruct the jury on both intentional murder and second-degree manslaughter, offenses with conflicting mental states, when the evidence presents

---

**1.** "At common law a charge of murder embraced all the lower degrees of culpable homicide" and "the jury may find a defendant guilty of a lesser-included offense, even though there is no evidence to support the lesser than the greater crime...." *Smith v. Commonwealth*, Ky., 737 S.W.2d 683, 688–89 (1987).

**2.** Model Penal Code Section 2.02(5): Substitutes for Negligence, Recklessness and Knowledge. When the law provides that negligence suffices to establish an element of an offense, such element also is established if a person acts purposely,

knowingly or recklessly. When recklessness suffices to establish an element, such element also is established if a person acts purposely or knowingly. When acting knowingly suffices to establish an element, such element also is established if a person acts purposely.

**3.** *See* Robert G. Lawson and William H. Fortune, *Kentucky Criminal Law*, Section 2–2(c)(2) (LEXIS 1998) for a discussion of inferences which can be drawn from the General Assembly's failure to include Model Penal Code Section 2.02(7) in the final legislation.

a question as to whether a given act was accomplished intentionally or wantonly. However, when all of the evidence proves beyond a reasonable doubt that someone acted intentionally, as is the case here, the requirements of another competing mental state, as a matter of law, cannot be established.

In *Hudson v. Commonwealth*, Ky., 979 S.W.2d 106, 110 (1998), we stated that evidence of the mental state connected with a criminal act may be inferred from examining the results of that act:

> Intent to kill can be inferred from the extent and character of a victim's injuries. Further, because a person is presumed to intend the logical and probable consequences of his conduct, "a person's state of mind may be inferred from actions preceding and following the charged offense.

*Id.* (citations deleted); *See also McGinnis v. Commonwealth*, Ky., 875 S.W.2d 518, 524 (1994). Some crimes cannot rationally be viewed as the product of wanton acts because the tangible results of those crimes demonstrate the absurdity of defining certain actions within the scope of risky behavior contemplated by the Kentucky Penal Code's definition of wantonly. *See, Moore v. Commonwealth*, Ky., 771 S.W.2d 34, 37 (1989) (victim was pushed down an embankment, shot at and missed, and then shot in the head four times including a contact wound to the top of the head); *Foster v. Commonwealth*, Ky., 827 S.W.2d 670, 677 (1991) (five victims were brutally killed over a period of four hours, each shot at close range, stabbed repeatedly, crushed by a car, and in some instances burned, then left for dead at three separate locations throughout the city); *Hal-*

*vorsen v. Commonwealth*, Ky., 730 S.W.2d 921 (1987) ("In view of the number, location, and lethal magnitude of the gunshots, it would have been unreasonable to give a wanton murder instruction." *Id.* at 925);

Bess Horton's murder was the product of a criminal act which cannot rationally be described as the product of a wanton or reckless mental state. Bess Horton's murderer began by sawing open his victim's throat with multiple passes of a knife, and finished, in the words of the majority opinion, by stabbing her "in the head with such force that the knife buried to the hilt in her right temple and the point of the blade protruded from her left temple." A jury could not reasonably conclude that Bess Horton's murderer's decision to hack the victim's throat apart and plunge his blade through her skull "created a risk" that Bess Horton would die and that the murderer either ignored the risk or was too drunk to appreciate the possibility that stabbing someone through the head can kill them. The murderer could only have sawed the victim's throat open and buried his knife between her temples if "his conscious objective [was] to cause [her death]." KRS 501.020(1). The evidence in this case did not justify a second-degree manslaughter instruction because there is no evidence from which a reasonable juror could believe that Fields unintentionally killed Bess Horton.

The majority holds, however, that the evidence of voluntary intoxication presented by Fields entitles him to a second-degree manslaughter instruction as a matter of law. While incorrect, the majority's conclusion is understandable given the haphazard and inconsistent voluntary intoxication jurisprudence in this state,[4]

---

4. Since the time of the American Civil War, Kentucky courts have recognized that evidence of voluntary intoxication was somehow significant to homicide prosecutions. The exact role of evidence of voluntary intoxication, however, has been far from consistent. At times courts have held that evidence of voluntary intoxication requires the trial court to instruct the jury as to the lesser included offense of voluntary manslaughter because evidence of voluntary intoxication may influence a jury's determination of the presence of malice aforethought. *See, e.g., Smith v. Commonwealth*, 62 Ky. 224, 1 Duvall 224, 227 (1864); *Golliher v. Commonwealth*, Ky., 63 Ky. 163, 2 Duvall 163, 165 (1865); *Blimm v. Commonwealth*, 70 Ky. 320, 7 Bush 320, 325 (1870); *Shannahan v. Commonwealth*, 71 Ky.

particularly before the adoption of the Kentucky Penal Code.[5] Prior to today's majority opinion, however, the law in this state has always been that, even in intentional homicide cases presenting questions of voluntary intoxication, lesser included offenses requiring unintentional mental states should be given only where justified by the evidence. This was the case both early in our Commonwealth's jurisprudence and just before the adoption of the Kentucky Penal Code. *See, e.g. Marshall v. Commonwealth*, 141 Ky. 222, 132 S.W. 139 (1910) (Defendant's murder conviction for decapitating his former girlfriend with a razor affirmed despite trial court's refusal to instruct on lesser included offenses); *Harris v. Commonwealth*, 183 Ky. 542, 209 S.W. 509, 511 (1919) (No reversible error where the trial court refused to instruct on manslaughter in light of evidence showing the defendant pur-

chased bullets for his pistol one afternoon, shot his wife, then bought more bullets and "fired several more shots into her lifeless body." *Id.*); *Weick v. Commonwealth*, 201 Ky. 632, 258 S.W. 90, 93 (1924) (No error in refusing to instruct on manslaughter where defendant laid in wait for his victim to ride by on the victim's bicycle and shot him once with a rifle and twice with a pistol); *Richards v. Commonwealth*, Ky., 517 S.W.2d 237, 240 (1975) (Conviction affirmed despite failure to instruct on voluntary manslaughter because "[i]n the case now before us there was no evidence of sudden heat of passion, sudden affray, or provocation. Therefore, Richards was not entitled to an instruction on voluntary manslaughter regardless of his drunkenness at the time he shot Carter." *Id.*); *Elmore v. Commonwealth*, Ky., 520 S.W.2d 328, 331 (1975) (Conviction under voluntary man-

463, 8 Bush 463, 470–71 (1871); *Rogers v. Commonwealth*, Ky., 96 Ky. 24, 27 S.W. 813, 814 (1894); *Bishop v. Commonwealth*, 109 Ky. 558, 60 S.W. 190 (1901); *Pash v. Commonwealth*, 146 Ky. 390, 142 S.W. 700 (1912); *Graham v. Commonwealth*, 200 Ky. 161, 252 S.W. 1012 (1923); *Shorter v. Commonwealth*, 252 Ky. 472, 67 S.W.2d 695 (1934); *Horn v. Commonwealth*, 292 Ky. 587, 167 S.W.2d 58 (1943) Other times, the courts have held that evidence of voluntary intoxication cannot reduce a crime from murder to manslaughter, but should be considered by the jury in determining whether to sentence the defendant to death or life imprisonment. *Harris v. Commonwealth*, 183 Ky. 542, 209 S.W. 509 (1919); *Thomas v. Commonwealth*, 196 Ky. 539, 245 S.W. 164 (1922); *Perciful v. Commonwealth*, 212 Ky. 673, 279 S.W. 1062 (1926); *Lawson v. Commonwealth*, 222 Ky. 614, 1 S.W.2d 1060 (1928).

5. It is possible that some of the lingering confusion concerning the state of the law of voluntary intoxication in the Commonwealth stems from the hybrid of ill-defined statutory and common law of homicide within which the "defense" developed:

In 1974, before adoption of the Penal Code, Kentucky had nearly a dozen homicide crimes. Most were narrow in scope (e.g. lynching and mob violence, killing through the negligent operation of a motor vehicle, homicide through an act of abortion, etc.) and duplicative of the coverage

provided by the more broadly defined homicides of murder, voluntary manslaughter, and involuntary manslaughter. Involuntary manslaughter was defined by statute; statutes on murder and voluntary manslaughter prescribed penalties for conviction, but left definition of the offenses to common law sources and principles.

Murder was defined as a killing with malice aforethought. The words "malice" and "aforethought" were unhelpful if not confusing; the exact nature of the offense was unclear. The following homicides constituted murder before the adoption of the Code: intentional killings, "depraved heart" killings, and felony murder. Voluntary manslaughter was defined as a killing in sudden affray or sudden heat of passion upon provocation calculated to excite passion beyond control. Limited to intentional killings, voluntary manslaughter operated essentially to mitigate penalties that would ordinarily have been imposed for conviction of intentional murder. The statute on involuntary manslaughter created two degrees of the offense, one with felony penalties (below those for voluntary manslaughter) and one with misdemeanor penalties. The felony was defined as a killing with "wanton indifference to life" while the misdemeanor was defined as a killing through "reckless conduct."

Robert G. Lawson and William H. Fortune, *Kentucky Criminal Law*, Section 8–1(a) (LEXIS 1999) (footnotes deleted).

slaughter instruction given as lesser included offense in murder indictment reversed because "the giving of a voluntary manslaughter instruction is proper only in those instances where there is evidence that will support the giving of the instruction." *Id.*). After the adoption of the Kentucky Penal Code, the law regarding when to instruct on lesser included offenses remained the same. *See Jewell v. Commonwealth*, Ky., 549 S.W.2d 807, 814 (1977); *Salisbury v. Commonwealth*, Ky. App., 556 S.W.2d 922, 925 (1977) (Conviction under voluntary manslaughter instruction given as lesser included offense to murder affirmed because "in addition to the evidence of intoxication, there is evidence that the shooting occurred in sudden affray or sudden heat of passion." *Id.*); *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 413 (1988) (Murder conviction affirmed despite trial court's refusal to instruct upon wanton murder and second degree manslaughter because defendant's defense that another person committed the murder presented no evidence justifying an instruction which required a wanton mental state); *McGuire v. Commonwealth*, Ky., 885 S.W.2d 931, 935 (1994) ("[Prior dicta implying that lesser included offenses should never be given when the trial court instructed on voluntary intoxication as a defense to an intent crime] is not correct *where the evidence presents lesser included* or other *offenses involving wantonness* or recklessness as a culpable mental state, because voluntary intoxication is not then a defense." *Id* at 935 (emphasis added)).

Today's majority opinion gives birth to a new principle of law that every intentional homicide case in which sufficient evidence is presented to justify a voluntary intoxication instruction pursuant to KRS 501.080 also involves questions of wantonness, and the jury must be instructed on second-degree manslaughter. I simply do not agree with this conclusion for a number of reasons.

First, the majority's holding relies on inadequate precedential support when it cites to this Court's opinion in *Slaven v. Commonwealth*, Ky., 962 S.W.2d 845 (1997) to support its conclusion that a trial court commits reversible error by failing to instruct on second-degree manslaughter as a lesser included offense to an intentional homicide prosecution when the evidence supports a voluntary intoxication instruction. Notwithstanding the fact that the language of *Slaven* does not reach as far as today's majority opinion,[6] *Slaven's* precedential value is no greater than the authorities upon which it relies. A close examination of those authorities reveals that *Slaven* either overlooked the precedent contrary to its holding or intended to change the law in this area by silently overruling precedent suggesting that the decision of whether to instruct on lesser included offenses in intoxication cases requires examination of the evidence presented. It appears to me that the first possibility is the more probable, and I view *Slaven* as an aberration rather than a watershed change.

The only case cited in *Slaven* is *Meadows v. Commonwealth*, Ky., 550 S.W.2d 511, 513 (1977), which was decided twenty

---

**6.** Today's majority describes the interaction between the voluntary intoxication defense and lesser included offense instructions in stating:

> ... the defense of voluntary intoxication does not authorize an acquittal if the jury finds the defendant was so intoxicated that he could not form the requisite intent to commit murder. Rather, its effect is to reduce the offense from the intentional crime of murder (or first-degree man-

slaughter) to the wanton crime of second-degree manslaughter.

In *Slaven v. Commonwealth*, Ky., 962 S.W.2d 845 (1997), the Court's language was less rigid and the holding was that the jury's belief in the intoxication defense "*could* reduce the offense from intentional homicide to wanton homicide...." *Id.* at 857 (emphasis added). While the *Slaven* version can be interpreted consistently with *McGuire v. Commonwealth*, Ky., 885 S.W.2d 931 (1994), today's majority opinion cannot.

years before. Three years before *Slaven,* this Court decided *McGuire, supra* and reaffirmed the principle that the trial court should give no instructions on lesser included offenses unless they are justified by the evidence. Despite the fact that the majority today cites *Slaven* for a conclusion squarely contradicted by our holding in *McGuire,* the Court has made no attempt to distinguish or address *McGuire.*

The authority *Slaven* did address, *Meadows, supra,* is not properly cited as authority for the proposition that lesser included offenses should be given in these cases even if not warranted by the evidence. In *Meadows,* the defendant claimed he accidentally discharged his shotgun and killed the victim, and also alleged that he had consumed alcohol and medicine prior to the shooting. The trial court instructed the jury on intentional homicide and, apparently, on the lesser degrees of wanton and reckless homicide, but did not feel that the evidence warranted a voluntary intoxication instruction, and this Court agreed. However, because the evidence relating to accidental shooting justified instructions on wanton and reckless homicide, the majority remarked in dicta: "The only tangible effect the evidence of intoxication would have had was to reduce the offense from intentional homicide to wanton or reckless homicide." *Meadows, supra* at 513. In other words, the trial court in *Meadows* felt that there was sufficient evidence of wanton or reckless conduct, absent any consideration of the defendant's intoxication, to justify instructions on lesser offenses, and, in that context, a separate voluntary intoxication instruction as a defense to intentional homicide would have only directed the jury to consider the lesser offenses. In the process of laundering the holding in *Meadows* through *Slaven,* this rationale is discarded, and, for the first time in Kentucky jurisprudence, this Court tells the trial courts of this state to give instructions which are not warranted by the evidence.

Second, the only other authority cited in *Slaven,* the 1974 Commentary to the voluntary intoxication statute, KRS 501.080, explicitly contradicts the conclusion reached by today's court. The Commentary reads:

> In its definition of "wantonness," KRS 501.020 requires as an element of this culpable mental state an awareness by the actor of a substantial and unjustifiable risk that a result will occur or that a circumstance exists. This element of "awareness" is used to distinguish "wantonness" from "recklessness." In making this distinction KRS 501.020 expressly provides that "unawareness" of a risk, if caused solely by voluntary intoxication, *does not preclude a showing of "wantonness." Id* (emphasis added).

The Commentary indicates that while voluntary intoxication alone does not constitute wantonness, a defendant who has failed to recognize a risk by virtue of his intoxication cannot defend against a claim of wantonness on the basis of his intoxication and that the evidence could still show he was acting wantonly as defined at KRS 501.020. "Does not preclude" is not synonymous with "constitutes," and the Commentary to KRS 501.080 is hardly support for the majority's conclusion to the contrary.

Third, the majority mutates the definition of "wantonly" in KRS 501.020(3) and concludes, apparently as a matter of law, that a defendant who persuades a jury that he was sufficiently intoxicated to negate the intent element of intentional murder, has demonstrated "the element of wantonness necessary to convict of second-degree manslaughter." In other words, the majority opinion misinterprets the parallel definition of "wantonly" in the third sentence of KRS 501.020(3) to require *only* voluntary intoxication. The majority discovers this incomplete definition by deleting the language "A person who creates such a risk but is unaware thereof" from the last sentence of KRS 501.020(3), quoting the remainder of that sentence out of

context, and concluding that "[t]he definition of 'wantonly' provides that a person who acts wantonly 'solely by reason of voluntary intoxication also acts wantonly with respect thereto.' "

This redefinition ignores KRS 501.030's requirement that a voluntary act which creates certain risks accompany a culpable mental state. A correct reading of the third sentence of KRS 501.020(3) must recognize that it is only operative in situations where someone's behaviors objectively and independently of intoxication would create the types of risks contemplated in the previous sentences. The language in KRS 501.020(3) concerning voluntary intoxication merely serves to "eliminate, in this one situation, the distinction between the mental states of 'wantonly' and 'recklessly,' " by:

> [B]ring[ing] into play a special definition of "wantonly," one that eliminates the need for proof of awareness and conscious disregard of risk. The intoxicated actor who fails to perceive risk that would have been perceived by a sober actor is treated as though he was aware of and consciously disregarded the unperceived risk.

Lawson and Fortune, *Kentucky Criminal Law*, Section 2–2(d)(3) (LEXIS 1998). *See also* Commentary to KRS 501.080 (quoted above). Today's majority also overlooks *Todd v. Commonwealth*, Ky., 716 S.W.2d 242 (1986), where this Court focused on the statutory language of KRS 501.030(3) and correctly explained the interaction of the sentences in that subsection: "A person who creates such a risk [a substantial and unjustifiable risk that a result will occur] but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto." *Id.* at 246 (brackets in original). We held in *Todd* that a proper reading of the last sentence of KRS 501.020(3) required two conditions precedent to a finding of wantonness: (1) Conduct creating the type of risk defined in this subsection, and (2) obliviousness of that risk by virtue of voluntary intoxi-

cation. Today's majority jettisons (1) and labels as wanton conduct any voluntary intoxication which is sufficient to excuse an intent crime.

Finally, I dispute the majority's conclusion: "[I]f a defendant was so voluntarily intoxicated that he killed another without the intent to do so, the fact of his voluntary intoxication, itself, constituted the element of wantonness necessary to convict of second-degree manslaughter." In other words, the majority holds that any defendant who kills another person after voluntarily ingesting quantities of alcohol or other controlled substances to the point where he is too intoxicated to form the intent necessary to commit intentional murder has, as a matter of law, committed second-degree manslaughter. KRS 507.040 defines second-degree manslaughter: "A person is guilty of manslaughter in the second degree when, including, but not limited to, the *operation of a motor vehicle*, he wantonly causes the death of another person."

The Court holds today that any person who drinks a large number of beers and takes some "horse tranquilizers" creates a "substantial and unjustifiable risk [that he will kill someone] ... of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." KRS 501.020(3). While I see no reason to applaud gross substance abuse, I cannot conclude, especially in the absence of any evidence submitted on this issue at trial, that voluntary intoxication, standing alone, creates a risk that the abuser will kill someone and that this risk is sufficient to justify a second-degree manslaughter instruction. KRS 501.060(3); *See, e.g. Lofthouse v. Commonwealth*, 13 S.W.3d 236 (Ky.2000). The jury did not find that Fields' risky substance abusive behavior buried a knife between Bess Horton's temples. They determined that Fields himself committed murder and they did so in the face of instructions which properly informed them they could

acquit Fields if they felt he was too intoxicated to know what he was doing. There was nothing wanton about Fields' crime and the trial court properly declined to give instructions not warranted by the evidence. I cannot agree with the majority opinion's conclusion that an intentional crime (murder) somehow sublimates into an unintentional crime (second-degree manslaughter) when a defendant is too intoxicated to form the intent to commit the intentional crime. The trial court correctly decided it was unnecessary to instruct the jury on second-degree manslaughter.

I would affirm the conviction.

GRAVES, WINTERSHEIMER, JJ., join this dissent.